Magee v. Billingsley.

----

## MAGEE v. BILLINGSLEY.

1. It is a general rule of the common law, that by the mere contract of sale, the property in the thing sold passes to the vendee, yet he is not invested with a right to the possession, if no credit was agreed upon, until the price is paid, or tendered.

2. Where the sale is perfect, the goods are placed at the buyers risk, even before delivery, and if they perish without the sellers fault, the purchaser is bound to pay the agreed price.

3. Goods are not transferred to the vendee by the contract of sale, if any material acts remain to be done before delivery, to distinguish them, or ascertain their price; or where a sale is made subject to the condition of weighing, counting, or measuring, the property does not vest in the buyer until the goods are weighed, counted, or measured.

4. Upon a sale of goods by sample, there is an implied warranty by the seller, that the bulk of the commodity is equal in quality to the sample exhibited to the buyer; and if it does not correspond, the purchaser may refuse to receive it, or if received he may return it in a reasonable time, allowed for examination, and thus rescind the contract.—But if he keep the goods and use them as his own after time allowed for inspection, he cannot repudiate the purchase, though he may maintain an action for a breach of the implied warranty.

5. Where goods are sold by sample, the property passes immediately to the vendee, if the performance of no act is stipulated by either party as a condition precedent, and the loss resulting from their destruction must be borne by him, if they were of the quality indicated by the sample; if they were not of that quality their destruction cannot deprive him of the right of repudiating the contract, where a reasonable time had not elapsed for examination, nor can it revive that right, if such time had passed previous to their loss.

6. Where a contract is made for the sale of cotton stored in a warehouse, and an order given to the purchaser, addressed to the warehouseman, directing the latter to deliver to him the cotton, the *prima facie* inference is, that the seller intended to part with the property and possession to the buyer.

7. A warehouseman is an agent of the party storing goods with him merely for the purpose of taking care of them, and a notice to him by one who has made a contract for them, that he will not receive them, is no notice to the seller.

8. Evidence which does not tend to establish any material fact, is inadmissible.

9. Where the seller of goods makes a false representation as to their quality and condition, the buyer, upon ascertaining it, may rescind his contract.

10. An agreement was entered into to purchase an entire crop of cotton, without reference to quantity, (then in a warehouse where the contract was made,) at an agreed sum per pound, all of which had been weighed by a public weigher within seven days preceding; the price was to be paid when called for, within a few days, and an order on the warehouseman was given to the purchaser: *Held*, that weighing was not annexed by the parties as a term of the contract necessary to complete the sale, and the law would not imply it in the absence of proof showing it was contemplated; inasmuch as it was not necessary to ascertain the aggregate sum to be paid.

11. A charge upon an abstract point of law, not calculated to mislead the jury, furnishes no ground for the reversal of a judgment.

12. An error in a single expression contained in a charge to the jury, *if explained and corrected*, so that the jury could not have been misled by it, will not be fatal to the judgment.

Writ of error to the County Court of Mobile.

THIS was an action of *assumpsit*, in the County Court of Mobile, by the defendant in error, against the plaintiff. The causes of action alleged in the declaration are, work and labor done, goods, wares and merchandize sold and delivered, money had and received, and an account stated. The cause was tried on the general issue. On the trial the defendant excepted to the ruling of the Court, and now assigns the same for error. From the bill of exceptions it appears, that evidence was adduced, showing that on the morning of the 23d April, 1840, William Hutchinson, a cotton broker in the city of Mobile, entered into a contract with A. Pope & Son, the factors of the plaintiff, in that city, for the purchase of the plaintiff's crop, which had been previously stored in an open shed, adjacent to Hitchcock's Press, and under the control of its lessees. The precise number of the bales were not known, but it was understood, there were above seven hundred. The price agreed on was seven and three-eighth cents, to be paid in cash, that is, when called for, within three or four days. There was some conversation between the broker and Pope & Son, as to the

condition of the cotton—the former testifying that the latter said it was in good order, and the latter that they said it was in good order, or they would put it in good order. It It was also stated at the time of the contract, that some of the cotton had been picked. Hutchinson testified, that on the morning of the 24th of April, 1840, he stated to Pope, that he should require the cotton to be re-weighed, but of this Pope stated he had no recollection. Hutchinson also made the same requirement of the weigher of Pope & Son, who replied that the cotton had been weighed within a short time previously, and that it was useless to re-weigh it; to this remark of the weigher, Hutchinson did not rejoin.

It was in evidence, that on the 17th April, 1840, some of the cotton had been weighed by the weigher of Pope & Son, at their request, and that some had been weighed since that day. A full table of weights was exhibited by the weigher at the trial, but there was no proof that it was shown to Hutchinson, or that there was any further conversation between the parties than is detailed above.

Hutchinson stated it was his custom to require all cotton purchased by him to be weighed after his contract, by the weigher of the seller. It was also shown, that about 10 o'clock on the morning of the 24th of April, a delivery order was given to the clerk of Hutchinson, as follows:

"Hitchcock's Press will deliver to William Hutchinson, all the cotton sent in store by us, marked T. B., more or less, also twenty-six bales marked J. A. C., and three H. P.

A. POPE & SON.<br>per M. B. Cook."

April 23, 1840.

Pope & Son caused an entry to be made in their books of the transaction, and upon the delivery of the order at the Press, the following entry was made in the books of the proprietors:

| "April 23, | A. Pope & Son,<br>William Hutchinson. | T. B., more or less.<br>J. A. C.,   26.<br>H. P.      3." |
|---|---|---|

The delivery order was presented at the Press about 10 o'clock, A. M. of 24th April, 1840, when the Press-men turned down about four hundred bales for examination and ship-marking; and about 4 o'clock, the clerks of Hutchinson began to examine the cotton—Hutchinson not having seen it, the

43

contract being made merely upon an exhibition of samples. After examining about one hundred and twenty bales, and placing the shipping marks of the defendant upon them, the clerks of Hutchinson found some cotton greatly out of order. They went through the cotton which had been turned down to them, and found, according to their testimony, the whole in indifferent order, and some unmerchantable and unfit for compression; about two hundred and fifty bales were in this latter condition. The Press-men testified, that from one hundred and fifty to seventy-five bales were out of order. Pope testified that the cotton had been re-picked, which fact was notorious, and he supposed the defendant must have known it. With a view to show an abandonment of the contract by Magee, his counsel proposed to prove that he came in while the clerks were examining the cotton, and directed them to mark no more; and, further, they offered to read a letter to Hutchinson, dated 24th April, 1840, by which Magee informed him he would have nothing more to do with the plaintiff's cotton; this evidence was objected to by the plaintiff's counsel; their objection sustained, and thereupon the defendant excepted. It was further in evidence, that neither Hutchinson, Magee, or their agents had any thing more to do with the cotton, and that on the same evening it was consumed by fire; about three-fourths of a day was necessary to re-examine such a parcel of cotton, and the same length of time to weigh it.

The ware-house keeper stated, that when an order was brought to him, he took down a copy of it for fear of its loss; that when the name of the principal is disclosed, an entry is made on another page of his book, setting out the name and shipping marks. He stated that the cotton could not be examined without such an order as the broker produced: it was frequently the case, that on examination the broker rejected the purchase: if a small parcel was rejected, it commonly made no difference, but when a large parcel was rejected, he could not give a receipt without the consent of the factors. He also stated that the only effect of the delivery order was to permit the broker to have the cotton examined and weighed; but the property was not changed until a second entry was made as above stated.

The plaintiff then called the broker to prove his agency,

who stated on his cross-examination, that he always examined cotton after his contract, and took fresh samples; and that the delivery order was to enable him to have the cotton examined and weighed; and if the cotton was found materially to vary from the samples, in any considerable parcel. it was rejected; because the average would not be that upon which the price was calculated. It also appeared that no insurance could be effected upon cotton, in the shed in which the cotton in question was stored. On these facts, the Court charged the jury as follows:

1. If the cotton was sold by samples, and it did not correspond with the samples by which it was sold, the purchaser had a right to refuse to receive it.

2. If the cotton was represented by the seller to be in a good condition when sold, and on examination found to be in bad order, the purchaser had the right to reject it.

3. If the cotton was such as represented when sold, both as to quality and condition, then the agreement to purchase, and receiving the order on the ware-house keeper, was a sufficient delivery and sale; and the purchaser was bound to take it, although it may be destroyed by fire before its actual delivery. If, between the sale and the actual delivery of the cotton, it should advance in price, the purchaser holding the order on the ware-house, would be entitled to receive the cotton, and the planter or commission merchant, could not rescind the contract. These, I lay down as general rules. But it is contended on the part of the plaintiff, that the cotton was such as represented when sold, and that, therefore, it was after the delivery of the order to the purchaser at his risk. This is matter for your ascertainment, from the evidence before you.

Again: the plaintiff's counsel contends, that if the defendant had a right to rescind the contract, he was bound to notify the plaintiff, or his agent, of his determination to do so at the earliest practicable time. In this, I entirely agree, and it is for you to say, whether between the time of the delivery of the order to the defendant, and the discovery that the cotton was not such as represented by the samples and assurances, he had a reasonable time, before the cotton was destroyed, to give notice of his determination to the plaintiff. I do not mean to be understood here, that the quality and condition of the cotton

was in fect, misrepresented by the plaintiff. This is one of the questions for you to settle. The defendant contends that he is not liable; because, he says, the cotton was not such as represented to him when purchasing, and he had, therefore, a right to repudiate the contract, and that he did all that could in reason be required of him to notify the plaintiff. These are facts for your ascertainment. The defendant would make you and the Court believe, that his having repudiated the contract in the presence of the keeper of the ware-house, was sufficient notice to the plantiff. In this I cannot agree. Pope was the agent of the plaintiff; Hutchinson, the agent of the defendant. The ware-house keeper only received the cotton on storage, to be delivered to the plaintiff, or his agent, and having nothing to do with the sale of the cotton, could not be considered as the agent for either.

The defendant, however, contends further, that as the cotton was to be re-weighed, there could be no consummation of the contract, until that re-weighing took place. If such be the fact, and the right to re-weigh had not been waived by the plaintiff, it is for you to inquire who was to have the re-weighing done—if by the plaintiff, the contract was not complete until it was done—if by the defendant, did he have time, after receiving the order to re-weigh the cotton before it was burnt. To all of which the defendant excepted.

J. A. CAMPBELL, for tne plaintiff in error:—The contract between Pope & Son and Hutchinson, on the 23d April, did not operate a change of the property in the cotton. The aggregate amount of the price was not ascertained, but a further act was necessary. 6 Cow. Rep. 254; Poth. on sales, 190; Troplong Com. De La Vente, 86, 88; Motifs. Rapports et opinions, &c. 617–8. The delivery order was not an act by which the parties ascertained the price, this could only be done by weighing, unless that was dispensed with.

The contract being indefinite and indeterminate, it was necessary for the plaintiff to show something, on the part of Hutchinson, evincive of a determination to accept of the cotton without previously ascertaining the price, and to show his own intention to confer a right of property. The intention of the parties should harmonize on the point. Chitty on Con. 115;

3 Johns. Rep. 420; 9 Eng. C. L. Rep. 163; Troplong Com. De La Vente, 86–8.

The delivery order did not have the effect *per se*, to transfer the right of property in the cotton, and unaided, it cannot be intended that it was so received. An actual delivery would not have the effect to pass the property, if made under circumstances to authorise the supposition that it was intended to enable the performance of an act, which was necessary to the consummation of the contract. 7 Wend. Rep. 404; 14 ib. 32; Dana's Rep. 58; 6 Pick. Rep. 280; 6 East's Rep. 614; 13 Pick. Rep. 175; 36 Eng. C. L. Rep. 323; 10 ib. 138; 2 M. & S. Rep. 397; 7 G. & Johns. Rep. 406.

The purchaser of cotton by sample, has the right to examine the bulk, and verify the sample, before it can be considered as at his risk, if he insists on it; and a refusal to permit the exercise of the right, is of itself an excuse for the abandonment of the contract. Chitty on Con. 138; 7 Cow. Rep. 86; 8 Serg't & Lowb. Rep. 1; 1 B. & A. Rep. 387. The right to reject the purchase necessarily follows the right to examine; but this right must be exercised under a responsibility for improperly refusing to proceed with the contract. The contract was binding from the beginning; but if the right of examination is insisted on, before it became settled and determinate, the subject of the sale did not pass to the purchaser, and the seller, if aggrieved, would be left to his remedy against him for the wrongful refusal to proceed with the contract. 1 Camp. Rep. 113; 4 Esp. Rep, 95; 3 B. & P. Rep. 233; 7 Johns. Rep. 86; 6 Serg. & Lowb. Rep. 456; Poth. on Sales, Art. 311; Chitty on Con. 138; Ross on Vend. 176; Thornton v. Winn, 12 Wheat. Rep.

The evidence shows it was the intention of Hutchinson to exercise the right of examination, before the contract was definitely closed; the reasonable inference is, that the delivery order was received to enable him to do so. The purpose for which the paper was received, was a question of intention, open to explanation, and in itself it was entirely inconclusive. 7 Dana's Rep. 58; 4 Wash. C. C. Rep. 13 Peters' Rep. 89; 36 Eng. C. L. Rep. 323. But the object of giving or receiving the delivery order, was not considered by the County Court as a question of fact, but rather as a conclusion of law.

The remark of Magee, in the presence of the person having

the custody of the cotton, that he would have nothing more to do with it, was sufficient to show that the right of property had not vested in the purchaser. The evidence shows that the cotton was to have been weighed, and there is nothing to show that this was dispensed with, consequently the risk of the subject of the sale, was the plaintiff's, when it was destroyed.

As to the acts of partial ownership, by marking some of the cotton, &c. these are but *indicia* of the purchasers intention ; and the highest acts have been considered as not operating a change of property. 7 Dana's Rep. 58; 1 Taunt. Rep. 319; 4 Esp. Rep. 95; 7 Johns. Rep. 473, 11 Wend. Rep. 138.

Plaintiff's counsel commented on the case in 6 Rand. Rep. 473, and cited Com. on Con. 111; Chitty on Con. 112; 1 Mason's Rep. 437: Woods v. McGehee, 7 Ohio Rep. 127, 2d part.

He further argued, that in order to perfect the sale, it was necessary the cotton should have been individualized, (as the civil law writers express it,) before its destruction; that the "*faits contradictoirement*," as Troplong calls it, was not shown, nor the terms necessary to a consummation waived by the parties. If the price was uncertain, because the weight was unascertained, a mere waiver of that term of the contract, would not complete the sale, unless the price or weight was also agreed. Motis. Rapports et opinions, &c. 618.

The default on the part of the purchaser, will not consummate the sale, though it may subject him to damages. Where merchandize is not sold "*en bloc*," but by weight, count, or measure, the sale is not perfect, and the things sold remain at the risk of the seller, until they are weighed, counted or measured; but the purchaser may demand their delivery, and in case of a failure, recover damages and interest for the non-exetion of the contract. 1 Troplong Com. De La Vente, 86, 88.

Hopkins & Lesesne, for the defendant :—The property in chattels, at the common law, passed to the purchaser by virtue of the contract of sale, although there was no actual delivery, or writing attesting the contract. Long on Sales, 42, 261, '2, '5; Por. Rep. 88; 27 Eng. C. L. Rep. 92; 2 Kent's Com. 387; Shep. Touchstone, 224; S.ory's Conf. of Laws, 318, note 1st, 2d ed. 13 Pick. Rep. 183; 20 ibid. 283; 7 East. Rep. 558; 14 Wend. Rep. 31 ; 4 B. & Ald. Rep. 753. The 17th § of the English statute of frauds, first made a delivery, or something

equivalent, essential to transfer the right.   But if a virtual de-
livery was necessary at the common law, the delivery order
to Hutchinson operated as such *proprio vigore.*   Lickbarrow
v. Mason, 19 Law Lib. 281, 313, and cases cited in the notes;
3 Bos. & P. Rep. 68; 7 Taunt. Rep. 265, 292; 13 Pick. Rep.
173, 183; 7 East. Rep. 258, 556, '8; 14 ibid. 308; 11 ibid. 210;
1 ibid. 192; Long on Sales, 268, 275, '6-2 Serg't & Lowb.
Rep. 317, 380; 13 Eng. C. L. Rep. 206; 36 ibid. 320-7; Dana
Rep. 64; 1 Bos. & P. Rep. 69; 2 Campb. Rep. 243, '5, 344-5;
1 Pick. Rep. 481; Blackf. Rep. 326; 16 Maine Rep. 17; 17 ib.
344; 1 Yeates' Rep. 527; 2 Wash. C. C. Rep. 294; 6 Rand.
Rep. 473; 2 Camp. Rep. 243; 9 Cow. Rep. 119; 3 Mason's Rep.
107; 6 Porter's Rep. 138; 9 Eng. C. L. Rep. 170.

The re-weighing of the cotton was not a condition prece-
dent, in order to vest the property in the defendant.   The do-
minion exercised by the defendant's broker and clerks acting
for him, very satisfactorily show who was regarded as
the owner.   But it is immaterial what were the facts in this
respect, since the charge of the Court on the point is unob-
jectionable, very properly refering it to the jury to determine
what were the inferences from the evidence.   So in respect
to the examination of the cotton and the repudiation of the con-
tract, the charge was in effect, what the plaintiff's counsel ad-
mit the law to be.   And whether the contract operated to
transfer the right of property or not, the plaintiff cannot com-
plain of error, in point of law, but should have asked a new
trial in the County Court.   13 Maine Rep. 425; 15 ibid. 225.

Where the sale is for cash, the seller has the right to the
possession until the money is paid, although the right of pro-
perty passes to the puachaser immediately.   But where a cre-
dit is given, both the right of possession and property passes to
the purchaser, subject to the right of stoppage in *transitu,*
should he become insolvent before the goods reach their desti-
nation.   But these rights of the seller do not, however, prevent
the contract from being operative; during the period of deten-
tion, the goods remain at the risk of the purchaser.   19 Law
Lib. 432, note; 1 Camp. Rep. 109, 113; 10 Eng. C. L. Rep. 477.

The right of property passes by the delivery of the whole,
or a part, where in the latter case, there was no intention to
withhold the part not delivered.   1 Pick. Rep. 476; 2 H. Bla.

Rep, 504. The case cited from 10 Eng. C. L. Rep. 138, by the plaintiff's counsel, proceeded upon the ground, that the order to the ware-house keeper had never been presented or accepted, and he had not become the agent of the purchaser, so as to transfer to him the actual possession ; consequently, the case was within the statute of frauds. In some of the other cases cited, the mere giving a delivery order to the purchaser, was held to transfer the right of possession, where it appeared that there had been a valid contract of sale by a *memorandum* in writing, or the payment of the whole or part of the purchase money. In the case cited by the plaintiff, from 3 Bos. & P. Rep. 233, the contract was void by the English statute of frauds, the acceptance of possession not being such as it required, viz: an actual possession, with the intention to retain it.

If the seller deliver possession to the buyer, the right is transferred, though it may be necessary to weigh or measure the goods, in order to ascertain the price. 13 Pick. Rep. 183; 20 ibid. 280. The contract was complete on the 23d April, and there was no stipulation for re-weighing, such a thing was not contemplated, and was unnecessary, as the cotton had just been weighed. The contract in this respect was not modified the next day, and it may be questioned whether the plaintiff's factors could assent to such a modification. Long on Sales, 398; 1 Stark. Rep. 233; 1 Bailey's Rep. 648.

Though the Court stated it as a general proposition, that the contract of sale and delivery order, transferred the property in the cotton to the defendant, yet the subsequent part of the charge referred it to the jury to determine every question raised by the evidence, viz: by whom it was to be done, if at all, when, and whether it was waived by the defendant, &c. This was correct, as shown by the authorities. 7 Dana's Rep. 58, 63–64. Besides, the examination of four hundred bales and putting the ship mark on them without weighing, shows that re-weighing was waived.

Upon a sale by sample, the right of property passes to the vendee, but he may rescind the contract, if the goods are in a bad condition, or do not correspond with the samples. The rescission, however, must be made in a reasonable time, and until the seller is notified of it, the property is at the vendee's risk. 1 Camp. Rep. 190; 2 ibid. 530; 9 Wend. Rep. 574;

Chitty on Con. 366–7. But the purchaser cannot rescind, as a matter of course; the bad quality or condition of the goods, must be shown, if the vendor refuses to accept them and sues for the price.

A contract cannot be rescinded, unless the parties can be placed *in statu quo.* Chitty on Con. 275. And the remark of Mr. Magee, in the presence of the ware-house-keeper, does not amount to a rescission; because, even admitting the ware-house man to have been the agent of the plaintiff to accept a recission, there was no offer to return the delivery order. There was no evidence that the ware-house-man knew Magee as the purchaser authorised to rescind—and the letter of Magee, is a mere instruction to his broker to rescind, but does not amount in itself to a rescission, and was consequently properly excluded from the jury. 2 Eng. C. L. Rep. 317–380.

The charge of the Court upon Magee's letter, was upon evidence not before the Court, and abstract; but in itself it is unobjectionable. The same remark may be made in respect to the right of the purchaser to rescind the contract.

The case cited from 8 Eng. C. L. Rep. 1, does does not, as supposed, sustain the doctrine that the property does not vest in the seller until after the goods have been examined by the buyer, though nothing remains to be done by the vendor. In that case, the contract was rescinded, because the seller had not all the goods he had agreed to sell, when the purchaser called to inspect them. Chitty on Con. 134, note; 12 Law Lib. 189.

It was not admissible to show by proof the legal effect of the delivery order—the paper explained its own meaning, independent of mercantile usage. The order, especially after its recognition by the ware-house-man, operated to transfer the property, in the same manner that the delivery of the key of a ware-house, in which property sold, was stored.

To show what acts remaining to be done will prevent the property from vesting in the vendee, the defendants cited the following additional authorities: 17 Eng. C. L. Rep. 373; 1 ibid. 211; 12 Wheat. Rep. 193; 6 East's Rep. 614; 13 ibid. 522; 4 Camp. Rep. 237; 6 Cow. Rep. 250; Poth. on Sales, 187.

COLLIER, C. J.—It is a general rule of the common law, relative to sales of personal property, that by the mere con-

tract of sale, the property in the thing sold, passes to the purchaser, yet he has no right of possession, if the goods be not paid for and no credit were agreed upon. Therefore, he cannot take them, or sue for their non-delivery, until the price be paid, or tendered by him. 19 Law Lib. 431, note to Lickbarrow v. Mason; Chitty on Con. 4 Am. ed. 297, 350. Long on Sales 42, 2 Am. ed. Noy's Maxims, 88; Sheppard's Touchs. 225; Potter v. Coward, Meig's Rep. 22. And such in effect, is the rule of the civil law. Pothier says, " that as soon as the contract of sale is perfected, the thing sold is at the risk of the buyer, though it is not delivered to him; so that, if during this period it happens to perish, without the seller's fault, the seller is discharged from his obligation, while the buyer does not thereby become discharged from his, but still remains bound to pay the agreed price." Treat. on Con. 187, § 308 ; 1 White's Recopilacion, 185–6.

The common law of England, has, however, been modified by the seventeenth section of the statute of frauds, which enacts that " no contract for the sale of any goods, wares and merchandizes, for the price of 10 pounds sterling, or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note, or *memorandum* in writing, of the said bargain, be made and signed by the parties to be charged by such contract, or their agents, thereunto lawfully authorised." Long on Sales, 2 Am. ed. 44. The English decisions that have been made, since the enactment of this statute, touching the constituents of the contract of sale, have been generally influenced by it; hence, it is laid down, that where goods are sold, in order to complete the contract, the buyer must accept and actually receive the same, or a part thereof; give something in earnest, or part payment, or else the parties, their agents, &c. must make and sign some note, or memorandum in writing, of their bargain. Such is not the law in this State. We have no statutory provision similar to the section quoted; and, consequently, the common law remains unchanged.

It is not every contract for the sale of personal property, though binding in itself, that will so operate as to transfer the thing to the vendee *eo instanti;* the property remains in the ven-

Magee v. Billingsley.

dor; and the goods are at his risk, if any material acts remain to be done, before the delivery, to distinguish them, or ascertain the price thereof. Thus, where a portion of goods in a bulk are sold, no property passes to the vendee, if such part cannot be distinguished without weighing, measuring, &c. until it has been separated from the entire quantity. Chitty on Con. 299; Long on Sales, 267–8; Montif's Rapports et Opinions, &c. 617, 18; Pothier on Sale, 309.

In Zagury v. Furnell and another, 2 Camp. Rep. 240, the plaintiff sold to the defendants a certain number of bales of goat skins, at a stipulated price, supposed to contain five dozen each. It was shown to be the duty of the seller to count the skins, that it might be seen whether each bale contained the number specified in the contract; but before any of them were counted, they were destroyed by fire. The question was, at whose risk were the skins at the time of their destruction.— Lord Ellenborough was of opinion, that the enumeration of the skins was an act for the benefit of the seller, in order to ascertain the price; and as this remained to be done when the fire occurred, there was not a complete transfer of the property, and the skins continued at the seller's risk. So in Hanson and another v. Meyers, 6 East's Rep. 614, it appeared, that the vendee had agreed to purchase all the vendor's starch in a certain ware-house, at a stipulated price and term of credit. the exact weight was not known, but was to be afterwards ascertained, and fourteen days were allowed for the delivery. The vendor gave a note to the vendee addressed to the ware-house-man, requesting him *to weigh and deliver* to the vendee all his starch. The court of King's Bench held, that the contract contemplated that weighing should precede delivery, and that although a part had been weighed and delivered, yet the vendor might, upon the bankruptcy of the vendee, retain the remainder, which remained in the ware-house in his name, unweighed. And in Wallace v. Breeds, 13 East's Rep. 522, which was a contract for the sale of oil, it appeared to be the custom, before the delivery, for the seller's cooper to search the casks, and for a broker on behalf of both parties, to ascertain the foot dirt and water in each, (for which allowance was to be made,) and then the casks were to be filled up by the seller's cooper at their expense; it was held, that till these acts were done and delivery

made, the contract was not complete to pass the property, and the vendor might countermand the sale, upon the insolvency or subsequent bankruptcy of the purchaser. So, where a sale was made of ten out of twenty tons of flax, all being in mats of an unequal size and quantity, or of a stipulated number of tons of oil, which was part of a larger quantity in a cistern, a similar conclusion was attained.—Busk v. Davis, 2 M. & S. Rep. 397; Shepley v. Davis, 5 Taunt. Rep. 616; Austen v. Craven, 4 Taunt. Rep. 644; White v. Wilkes, 5 Taunt. Rep. 176. But it is needless to add to these citations, a further notice of English decisions on the point, since they all recognize the principle we have stated, although some of them may have mistaken its application to the facts of the particular case.

We will, however, notice some few of the adjudications made in the United States, and these too will be found, in general, to proceed upon the principle, that the thing sold is not put at the buyer's risk, where it is not in a deliverable state, as being to be counted, weighed, measured, or separated from something else, of which it forms a part. Thus, in Crawford v. Smith, et al. 7 Dana. Rep. 59, the plaintiff sold his stock of goods to the defendants, for which they were to pay by promissory notes, payable at stipulated periods. The parties, the day after the sale, began to invoice the goods, a few articles of which were sold during the same day as the goods of the defendants, with the plaintiff's assent. During the night of that day, and before all the goods were invoiced, a thief broke into the house and stole sundry articles, some of which were, and others were not, invoiced. The question was, on whom should the loss of the goods stolen, fall. The court held, that such of the goods as were not measured and invoiced, remained the property of the seller, who could not recover the value from the buyer; but those that were measured, invoiced and laid aside, had become the property of the purchaser. The principle was expressly recognized, that while any thing remains to be done by the seller, to ascertain the quantity or price, and there is no stipulation for passing the title before that is done, the title does not vest in the purchaser; the right of property, as well as possession, will remain with the seller, and the loss will be his if the property perish while the ownership is in that condition. But as soon as the quantity and price are ascer-

tained, and the goods are ready for delivery, upon the terms of sale being complied with, the title vests in the purchaser, and they are at his risk. The sale may be of many articles, the quantity and prices of which are to be ascertained; in such case, the title to each distinct article vests in the purchaser as soon as its quantity, or number, and value, are ascertained.

*And further*, it was decided that the intention of the parties as to the weighing, counting, or measuring goods sold, was a matter of fact, to be inferred by the jury alone, from the nature of the case, and all the accompanying circumstances. And it has been decided in New-York, that where there is any thing to be done by the parties, preparatory to ascertaining the price of goods sold, when the sale is for cash, a delivery of the article does not divest the title of the vendor until the price be ascertained and paid.—Ward v. Shaw, 7 Wend. Rep. 404; Andrew v. Dieterich, 14 Wend. Rep. 31.

The law has, however, been otherwise adjudged in Massachusetts; there, the general principle is admitted, that where any operation of weight, measurement, or counting, remains to be performed, in order to ascertain the price, the quantity, or particular commodity to be delivered, and to be put into a deliverable state, the contract is incomplete until such operation is performed. But where the goods or commodities, are actually delivered, that shows the intent of the parties to complete the sale by the delivery; and the weighing, measuring, or counting afterwards, would not be considered as any part of the contract of sale, but would be taken to refer to the adjustment of the final settlement as to the price. "The sale," say the Court, "would be as complete as a sale upon credit, before the actual payment of the price. Nothing can be found in any of the numerous cases on this point, which militates against this position."—Macomber, *et al.* v. Parker, 13 Pick. Rep. 175; Riddle v. Varnum, 20 Pick. Rep. 280.

In Pleasants v. Pendleton, 6 Rand. Rep. 473, it appeared that one merchant sold to another 119 barrels of fine flour, stored in a ware-house, the price was agreed, and the vendor gave to the vendee a bill of parcels, specifying the number of barrels of each particular brand, an order on the ware-houseman and a receipt in full; and in return received from him a check on the bank for the price of the entire quantity. At the

time of the sale, the vendor had 123 barrels of flour in the
ware-house—the 4 barrels not sold, being of the same brands
as some of those embraced by the bill of parcels and delivery
order to the ware-house-man. It was held, that the property
in the 119 barrels, passed to the vendee, notwithstanding the
want of separation; and that the vendor was entitled to reco-
ver the price of the vendee, though the warehouse, with its
contents, was destroyed by fire, the next morning after the
sale, before the actual delivery of the flour, and before, with
ordinary diligence, it could have been received. In Ohio, dis-
satisfaction with the case last cited, has been expressed in strong
terms; there the Court say, "it is impossible to hide from one'-
self, that the fact of the small difference between 123 barrels,
the whole quantity, and 119 barrels, the number sold, may have
gone a great way to influence the judgment. It was a hard
case, and hard cases always make shipwreck of principles. It
is impossible to answer the difficult question, if part only of the
flour had been burnt, in that case on whom would the loss have
fallen."—Woods v. McGee, 7 Ohio Rep. 127. The case de-
cided in Ohio, merely declares the principle which we have
already stated, viz: "that where a part of an undivided mass
of property is sold, it is necessary that some further act should
be done, specifying and identifying the part sold," in order to
vest the property in the vendee. In respect to Pleasants v.
Pendleton, it may be remarked, that if defensible at all, it pushes
principle to its utmost tension. The case before us does not
require us to give to the authorities, upon this branch of it, a
more critical and extended notice.—See Pothier on Sales,
190–1–2.

Troplong, a distinguished civilian and commentator, in ac-
cordance with the common law authorities, says, that where
merchandize is sold in bulk, or *per aversionem*, if the money
is paid or a delay of payment stipulated, the property imme-
diately vests in the purchaser. But if the sale is made subject
to the condition of weighing, counting, or measuring, the same
is not perfect, and the things sold are not put at the risk of the
purchaser, until they are weighed, counted, or measured; and
though the refusal to proceed in the performance of the condi-
tion of the contract, may put the party refusing in default, and
subject him to the recovery of damages, yet the sale is not

thereby completed.—See 1 vol. Com. on 6 tit. 3 Liv. Civil Code, 86–88.  In order to make a waiver of a term of the contract available, it must have been assented to by both parties.

To sum up the law, it may be laid down, that where the sale is made for cash, or on a stipulated credit, that it is not the delivery, or tender of the thing sold, or the payment or tender of the money, which invests the purchaser with the right of property, or which gives to the seller a right to recover the money.  The sale is complete as soon as both parties have agreed to the terms, that is, as soon as the one says I will take a certain price and the other undertakes to pay it; and their rights are then fixed.  The property in the thing passes to the vendee, and is at his risk, and he may demand the possession upon the payment or tender of the purchase money.  This is to be understood, as we have seen, where the contract does not contemplate some further act in order to place the property in a deliverable state; as to ascertain its price, &c.  Where this is the case, although the contract is valid, it is not regarded as executed, until after the act has been done.  But it is always a question of fact, to be determined by the jury, under the direction of the Court, whether the sale was consummated by the contract, or whether and by whom any thing remained to be done, in order to perfect it.

It is insisted, that the property in the cotton in question, did not pass to the purchaser until he had examined the bulk and found it to correspond with the samples furnished him.  In respect to sales by sample, there is an undoubted right to refuse to receive the goods, or if received, to return them in a reasonable time, allowed for examination, if they do not correspond with the sample.  But if the vendee, after time for inspection, treat the goods as his own, by exercising an act of ownership over them, he will be considered to have accepted them, and cannot afterwards repudiate the contract, so as to resist an action for the price; although he may still maintain an action for the breach of the implied warranty, that the bulk is agreeable to the sample.—Chitty on Con. 4 Am. ed. 366–7.  And it has been held, that on a sale by sample, the buyer has a right to inspect the entire parcel at any proper and convenient time; and if the seller refuse to show it, the buyer may immediately rescind the contract.—Lorymer v. Smith, 1 B. & C. Rep. 1;

or, 2 D. & R. Rep. 23. The result of the authorities is, that on a sale by sample, the vendor stipulates that the bulk of the commodity shall be equal to the sample, in quality.—Williams v. Spofford, 8 Pick. Rep. 259; Hastings v. Lovering, 2 ibid. 219; Sands v. Taylor, 5 Johns. Rep. 359; The Oneida Man. Co. v. Lawrence, 4 Cow. Rep. 440; Andrews v. Kneeland, 6 Cow. Rep. 354; Bradford v. Manly, 13 Mass. Rep. 139; Gallagher v. Waring, 9 Wend. Rep. 20; Beebe v. Roberts, 12 ibid. 413; Boorman v. Johnson, 12 ibid. 566; see cases cited in Ricks, adm'r. v. Dillahunty, 8 Porter's Rep. 133. And this stipulation is regarded in law as an implied warranty, not that the article is merchantable, but that the bulk corresponds with the sample, or is of the same quality.—Dane's Ab. Ch. 62, art. 2, sec. 17; Chitty on Con. 356, 4 Am. ed.; Long on Sales, 191; Ross on Vendors, 340, et post.

A sale by sample has been assimilated in argument, to a sale of wine, &c. upon the condition of being tasted; and Pothier on Sales, has been cited to show that, "in sales made subject to the condition of tasting, the buyer may refuse to execute the bargain, if he does not find the goods to his taste." And, "consequently, things sold do not become at the risk of the buyer, until he is put in delay to taste them."—See page 193–4. The learned author remarks further, in regard to such sales, "It is to be observed, also, that we must distinguish whether the buyer stipulates, that he shall taste the goods, in order to know whether they are to his taste or not, or only to know whether they are good, lawful, merchantable, or undamaged. It is in the first case only, that he is at liberty to refuse the bargain, by declaring, after tasting the goods, that they are not to his taste; in the other, he cannot refuse the goods, provided they are found to be good."—Page 194. Thus we see, that the condition in the sale, which gives the permission to taste, results from the nature and terms of the contract; and the consequences resulting from it depend upon the purpose for. which it was stipulated. If with the intention of ascertaining whether the goods are agreeable to his taste, as the buyer is the sole and final judge, the reason of the thing forbids that the property should vest in him, until he had decided whether the quality of the goods pleased him, and that he would receive them.— But if the stipulation was made, merely that the purchaser

might learn whether the goods were merchantable or undamaged, he cannot refuse to receive them, if they are found to be good; his contract is obligatory upon him, and he cannot repudiate it. The contract stated by Pothier, bears but a very remote similitude to a sale by sample; it is in principle the common case of a sale where some act remains to be done by the buyer in order to its consummation. Until such act be done, or waived, as we have seen, the right of property is not changed.

Warranties are either express or implied—in the first, the seller covenants, or undertakes in terms, that the goods are of a certain quality, &c. The latter description of warranty, is one not expressly made, but the law implies it from the fact and manner of the sale, as well as the character of the thing sold. "Thus, the seller of provisions tacitly agrees that they are wholesome at the time of delivery. So, the merchant abroad, who fills an order for his customer residing in this country, impliedly stipulates with the purchaser, that the goods are merchantable; and one who sells by sample, undertakes that the article furnished is of the quality of the sample shown." Ricks, adm'r. v. Dillahunty, 8 Porter, 139, and cases there cited. Now, if it be true, as we have seen, that where there is an express warranty, the bargain itself, by which the vendor agrees to sell and the buyer to purchase, passes *eo instanti*, the property in goods to the latter, unless some act remains to be done to put them in a deliverable state, why is it that the same result shall not follow, where there is only an implied warranty? Suppose an unconditional sale be made of provisions, will not the property vest immediately in the purchaser, or if the distant merchant send goods to the order of his correspondent here, are they not the property of the latter, and put at his risk from the moment they are addressed to him, or his order, and entrusted to the usual mode of conveyance? If the law were otherwise, consequences most ruinous, especially to purchasers, might follow. Goods forwarded from a distance might be seized on their *transit*, and subjected to the seller's debts, and this, although the buyer had paid for them. So, the purchaser of goods by sample, who advances his money previous to their inspection, would be liable to a similar misfortune, if he acquired no property in them.

44

The rule upon this point, then, which seems to us most consistent with principle, and in harmony with the general analogies of the law, is to consider the purchaser entitled to the goods and the seller entitled to the money, from the time the bargain is struck, giving to the former the right to refuse to receive them, or to reject them, if upon an examination made in a reasonable time after the sale, or receipt, they shall not agree with the sample. The property thus passing to the buyer, where no act is stipulated as a condition precedent to be performed by either party, the goods are immediately placed at his risk, and the loss resulting from their destruction must be borne by him, if they were of the quality indicated by the sample. If they were not of that quality, their destruction cannot deprive him of the right of repudiating the contract, where a reasonable time had not elapsed for examination; nor can it revive that right, if such time had passed previous to their loss.

With respect to the order to the ware-house-man, to deliver to Hutchinson all the cotton of the plaintiffs in store, it is not *conclusive* evidence to show a transfer of right; but the *prima facie* inference, from an inspection of the paper, taken in connection with the contract, is, that the seller intended to part with the possession as well as the property, in favor of the purchaser. Whether the presentation or acceptance of such an order to the keeper of the ware-house, was essential to invest the buyer with the dominion over the property, and to perfect the transfer of the vendor's right to the cotton, is a question which will not admit of serious controversy. In England, and some of the States of the Union, under the influence of the 17th section of the statute of frauds, or a similar enactment, it has been held, that to invest the vendee with a title to the goods, the order must be presented to the ware-house-man and accepted by him. But in this country, we have no such legislative provision, and by the common law, it is not necessary to a transference of right, that the keeper of goods should agree to become the vendee's bailee. The acts of the agents of the defendant, very strongly indicate that it was supposed the delivery order authorized the defendant to exercise the entire control over the cotton, or they never would have marked it for him. In Stoveld v. Hughes, 14 East's Rep. 308, it was held, that where the mark of goods lying in a ware-house is changed

by the direction of the seller and purchaser, it operates as an actual delivery.

The direction of the defendant, in the presence of the ware-house-man, to his clerks, to mark no more cotton, cannot amount to a notice to the plaintiff, that he would abandon the contract. The keeper of the ware-house was the agent of the plaintiff, for the purpose only of taking care of the cotton and delivering it to him, or his order, and a notice to the ware-house-man that a purchaser had refused to receive it, is not a notice in law, to the plaintiff. The letter of the defendant to his broker, does not amount to a repudiation of the contract; at most, it is an instruction to the broker to rescind, or an expression of the defendant's determination to do so. To make such evidence available, it should be shown that there was some act indicating a rescission, communicated to the plaintiff or his agent; such ancillary proof not being adduced, the letter was inadmissible, as it did not tend to establish any material fact.

Having examined the questions of law necessary to be considered, it remains but to notice the charges of the Court to the jury. In respect to the first and second charges, they are clearly unexceptionable. The first asserts the conceded principle, that the purchaser of goods by sample, may refuse to receive them, and repudiate the purchase, if upon inspection, the bulk shall be found not to be agreeable to the sample. The second merely affirms, that where the seller makes a false representation as to the quality and condition of goods, the buyer upon ascertaining it, may rescind his contract.

The remainder of the charge deserves a more elaborate examination. If, say the Court, the cotton was such as represented when sold, both as to quality and condition, then the agreement to purchase, and receiving the order on the ware-house, was a sufficient delivery and sale; and the purchaser was bound to take it, although it may have been destroyed by fire before its actual delivery. Again: If the cotton was to be re-weighed, it was for the jury to inquire, by whom was the re-weighing to be done; if by the plaintiff, the contract was not complete until it was done; if by the defendant, did he have time, after receiving the order, to re-weigh the cotton before its destruction. These instructions may be thus condensed: "If the cotton, as to quality and condition, was such as repre-

sented when sold, the contract and order to the ware-house-man, was a sale and delivery; but the jury should inquire whether the cotton was to be re-weighed, and by whom; if by the plaintiff, the contract was incomplete until the act was done: if by the defendant, did he have time, after receiving the order, to re-weigh the cotton before it was burnt." Now, although this charge may not be correct in the abstract, yet, as applied to the facts of this case, it does not show an available error. This conclusion will result from a consideration of the nature of the contract, and the situation of the cotton at the time it was entered into.

On the 23d of April, 1840, Hutchinson, a cotton broker of Mobile, entered into a contract with A. Pope & Son, the factors of the defendant in error, for the purchase of the crop of cotton of the latter, then stored in that city. The price was expressly stipulated at seven and three-eighth cents *per pound;* the place where the cotton was stored was known, but the precise number of bags was not, though supposed to be above seven hundred. Pope & Son, on the 17th of April, caused their weigher to weigh a part of the cotton, and the residue was weighed between that day and the day of sale. At the time the contract was made, nothing was said about re-*weighing* the cotton; but Hutchinson declared in his evidence to the jury, that he stated to Pope, on the morning of the 24th April, that he would require the cotton to be re-weighed; Pope testified, that he had no recollection of any such conversation.— Hutchinson also made the same requirement of the weighers in the employment of the messrs Pope, who stated to him that the cotton had been weighed but a short time previously, to which he made no reply. Hutchinson testified to the jury, that it was his custom to have cotton, purchased by him, weighed by the weigher of the seller.

The contract was perfected on the 23d of April; what passed between the agents of the parties on the succeeding day, cannot modify it, but can only serve to explain the sense in which it was understood by them, and as declaratory of the terms and conditions attached to it. The agreement was to purchase an entire crop of cotton then present, without reference to quantity, at a certain price per pound, all of which had been weighed by a public weigher within seven days prece-

ding. No stipulation is made for a credit ; but the money is to be paid when called for within a few days. · The effect of this contract, especially when coupled with the delivery order to the ware-house-man, vested the property in the buyer, and authorized the seller to demand the money. Weighing was not annexed as a term, the performance of which was necessary to consummate the sale; and the law would not imply it, in the absence of proof, showing that it was contemplated by the parties, inasmuch as it was not necessary to fix the aggregate price.

It cannot be said that the interpretation of the contract should have been referred to the jury, and the duties it injoined upon the parties respectively, ascertained by them ; for assuming the evidence, so far as it went to defeat a recovery, to be true, and making therefrom all reasonable deductions in the defendant's favor, yet there is nothing to authorise the inference that the contract contemplated the cotton should be weighed before the right of property vested in him. The absence of proof on this point, authorised the Court to assume the decision of the law.

That Hutchinson knew the cotton had been weighed previous to his purchase, is indicated by his declaration to Pope and his weigher, that he should require it to be *re-weighed.* But neither that requisition, or his custom, as he expresses it, to have cotton purchased by him re-weigded by the seller's weigher, can have the effect of introducing a condition into the contract, to which the Messrs. Pope had not previously assented.

We do not intend to be understood as deciding, that it was not entirely competent for the purchaser, had he so elected, to have had the cotton re-weighed, and claim a deduction for any deficiency between the true weights at the time of the sale and those previously ascertained ; and if the variance should be found to be very great, or disproportionately to lessen the value of the entire lot in market, we will not say that it would not be allowable to repudiate the purchase. The facts of this case do not require us to consider these questions. The legal proposition which we maintain is this, when a contract is entered into for the sale of an entire crop of cotton, or a certain number of bales (of defined marks) then in store where the contract is made, all of which had been weighed but a few days

previously, it is not indispensable to complete the sale, that the cotton should be re-weighed, unless the parties by express stipulation, make it necessary, or it be shown by proof that such is the usage of trade.   There is an entire absence of proof, showing any mercantile usage on this point, and we cannot intend that there is any which could change the legal meaning of the contract.   The evidence of the ware-house-man, as to the time when the property vested in the purchaser, and the effect of the delivery order, could have no influence in determining the law.   It was merely a declaration of his opinion.

If re-weighing the cotton was a term of the contract, it was certainly one in which each party was alike interested, and, consequently, could not be waived by either without the assent of the other.   But the evidence shows that the seller did not regard it as essential, and the fact of the purchaser examining and placing the shipping mark upon a number of the bales, without manifesting an intention to re-weigh them, would seem rather to indicate that it was not a pre-requisite to investing him with the property in the thing.   We do not mention this latter circumstance, as furnishing an argument entitled to great weight in itself, but rather confirmatory of others.

Taking, then, the contract to have been such as we think it was, and it will follow that the portion of the charge in respect to the re-weighing, either by the plaintiff or defendant, was uncalled for, and wholly abstract.   It could not have prejudiced, but was rather calculated to benefit the plaintiff in error, in referring to the jury an inquiry which the facts did not suggest. and making the liability of the purchaser dependent upon a consideration which the law did not attach to the contract.— The charge interposed difficulties to a recovery, which the contract, correctly interpreted, did not; but the misapprehension of the law could not possibly have injured the party complaining of it, and as it was upon a point foreign to the evidence, he cannot avail himself of it on error.

In referring to the argument of counsel, the Court say, "The plaintiff's counsel contends, that if defendant had a right to rescind the contract, he was bound to notify the plaintiff, or his agent, of his determination to do so, at the earliest practicable time.   In this I entirely agree, and it is for you to say, whether between the time of the delivery of the order to the defendant

and the discovery that the cotton was not such as represented by samples and assurances, he had a reasonable time before the cotton was destroyed, to give notice of his determination to the plaintiff." It was argued that the judge, in declaring his acquiescence in the argument of the plaintiff's counsel, required of the defendant greater diligence than the law exacted, in order to rescind the contract. This objection might be well founded, if the judge had said nothing more than to express his concurrence in the argument; but he goes farther, and very explicitly informs the jury, that a *reasonable time* was to be allowed to the defendant to give notice to the plaintiff of the abandonment of the contract, after the defectiveness of the cotton was ascertained.

The entire charge properly refers the questions of fact to the jury, while the Judge, in terms very intelligible, informs them what is the law as applicable to the facts. In itself, it was not calculated to mislead the jury, to the prejudice of the plaintiff in error; if either party thought it too inexplicit, additional or explanatory instructions should have been prayed.— The points here raised upon the assignment of errors, when considered in reference to the evidence, cannot be said to have been erroneously adjudged by the County Court; and it is not our province to inquire, whether the verdict of the jury was such as it should have been upon the facts disclosed in the bill of exceptions. If the jury improperly weighed the evidence, or misapprehended the law as applicable to it, the defendant should have asked a new trial.

This closes the view which we have thought it proper to take of this interesting and important cause; if we have erred, it is not because we have not sufficiently examined it, but from our inability to understand the grave and, to some extent, novel questions it presents. The result is, the judgment of the county Court is affirmed.

GOLDTHWAITE, J.—I do not concur in the opinion just pronounced, and will briefly state the reasons which lead my mind to a different conclusion from the judgment of the Court.

There can be no stronger illustration than is afforded by this case, of the necessity for fixed and certain rules, by which to ascertain the precise period at which the seller parts, and the

buyer becomes invested, with the right of property in a person-
al chattel. But this necessity does not arise from, nor are these
rules chiefly governed by, the peculiar situation of these par-
ties. It most frequently happens that creditors, insurers or
subsequent purchasers, are as much interested as the parties
themselves.

Such rules, indeed, have long since obtained, and in my
opinion, are amply sufficient to guide us correctly in all cases
which can possibly occur. One of the rules, coeval with the
common law, is, that if one presently agree to buy from ano-
ther, and pay him a specified price for his goods, and he agrees
to take it, the property of the goods is transferred without any
delivery, though the purchaser is not entitled to the possession,
until he has paid the price to the seller. This is an absolute
sale.

Another rule equally clear, admitted by all writers upon the
subject of sales, is that there may be *conditional sales*, and
that in all such, no *present right of property* passes to the buy-
er, but it remains in the seller until the sale is divested of the
condition. And I apprehend in these conditional sales the
*contract* is perfectly binding between the parties, although it
may never be executed. The right of property, however, re-
mains with the seller, and notwithstanding his contract, the
goods may be seized by his creditor, or may be sold by him
to another purchaser who may be invested with the title by
this subsequent sale, and the only remedy of the injured party
is by an action on the contract.

I also think there is a marked distinction between a condi-
tional sale, and a sale with warranty, whether the warranty
be express or implied only. In the first case, the matter is in
*contract* until the *acceptance* of the goods by the purchaser, if
the condition is for his benefit, or by its *performance*, if the
condition is for the benefit of the seller; but in the other, the
contract is *executed* and the purchaser has his remedy on the
warranty, without any act to be done by either party; or, ac-
cording to the more modern rule, he may rescind the contract
and claim a return of the purchase money, by returning the
goods when these do not correspond with the warranty.

With these rules in view, I will proceed to the examination
of this case as it is disclosed by the bill of exceptions. It is ev-

Magee *v.* Billingsley.

idently the ordinary case of a sale by sample, without any present delivery of the bulk.

When goods are sold by sample, and there is a delivery of the bulk, *without examination*, I apprehend nothing can be more clear, than that the property of the goods is *at once* invested in the purchaser, and he is thrown upon his contract on the implied, warranty if the bulk does not correspond with the samples; or he may return the goods, according to some modern cases, and sue for the money paid.

But where there is no present delivery, it seems to be conceded by all the adjudicated cases, that the purchaser always has the right to inspect the bulk, in order to ascertain whether it corresponds with the sample, and to refuse to receive the commodity, if it does not so correspond. It is not my purpose to review any of the many cases in support of this rule; it will be sufficient to refer to one only, because the existence of such a rule is decisive, in my opinion, to show that this case was put to the jury upon a false principle. The case I refer to is Hibbert v. Shee, 1 Camp. 113: where it is said the legal mode of dealing is, that if the article agreed on, is not furnished, the purchaser may reject it and keep his money in his pocket. This indeed is too obvious to require sanction from decision; but the consequences which flow from this rule of reason, as well as of law, seem to me, to furnish that which ought to govern this case.

If the purchaser has a right to *reject* goods when they do not correspond with the sample, this shows conclusively, that the property is not vested in him by the purchase, for it seems to involve a contradiction in meaning, to say that one may refuse to accept that which the law has already cast on him.

It is important to bear in mind that we are not now discussing the question how far a purchaser, who capriciously, or without good cause, refuses to pay for goods purchased by sample, but we are endeavoring to ascertain what is the law between these parties, and on which of them it casts this loss. It has already been shown, that the right to examine, is inseparable from a sale by sample *where there is no delivery*, and I cannot imagine a case, in which a loss, such as this, ought to fall on the purchaser until he has accepted the goods. If he delays examination, it always is within the power of the ven-

dor, to fix his liability by an offer of them, as it also is, if he capriciously or without cause, rejects them.

It is not the least conclusive view to my mind, that the purchaser has no sure method to guard himself by insurance, from loss, until he has determined the goods to be his by an examination, or by taking them into his possession. Is it for one moment to be imagined that Magee was bound to insure this cotton from fire before he had made the examination? or was he bound to do so, when upon that examination he had refused to receive it? On the other hand, let it be supposed that Billingsley was insured, and this case, instead of being as it is, was a defence by the insurers, on the ground that he had parted with the property. Ought such a defence to prevail? And yet, it seems to me, there would be nothing novel in these propositions if the true rule is ascertained by the judgment of this case.

I have previously said that the necessity for clear and definite rules upon this subject, do not arise merely out of the relation of the parties to the contract, nor are they chiefly governed by that relation, because creditors, insurers and subsequent purchasers most frequently are immediately interested in such rules. This is apparent from the numerous cases in which such persons are found to be parties to the contest; but, under the rule as declared by the Court, I can conceive of no case in which such persons could be heard. A creditor of the seller, certainly ought not to be permitted to seize the article sold when it does not correspond with the sample, for the reason that the purchaser may waive the defect. Yet in such a case, if the article is destroyed, the loss falls on the seller according to the judgment in this case.

Again, the purchaser is covered by an open policy against the risk of fire: is it possible that the insurer ought to be allowed to contest the right to recover when destruction ensues, because the bulk does not correspond with the sample, and therefore, as he might insist, the property yet belonged to the seller? I cannot think such is the law, although these consequences seem to flow from this decision.

Conceding the interpretation which is given to the charge of the County Court by this Court, to be correct, and that it must be understood as instructing the jury "that if the cotton as to quality and condition, was such as represented when sold, then

the contract and order to the warehouse-man, was a sale and delivery." I think it is erroneous for the reasons I have before stated, that the sale was nothing but *a contract* until the *acceptance* of the cotton by the purchaser, and if destroyed previous to such *acceptance*, it then, in contemplation of law, belonged to the seller, whatever may have been his right of action against the purchaser for refusing to receive it. In addition to this error, I think the question of delivery growing out of the giving of the order, was not a question of law, as in effect considered to be by the County Court, but a question of fact, to be determined by the jury according to the intention of both parties in giving and receiving it.

I have before said that we were not now considering whether the plaintiff may not be entitled to a verdict upon the contract of sale, if the cotton corresponded with the sample and description, and was placed at his risk by a tender; however this may be as the case was put to the jury, on what I consider to be an erroneous ground, I think the judgment ought to be reversed.