# Edwards, Hudmon & Co. v. Meadows.

*Action on Promissory Note; Defense, Failure of Consideration.*

1. *Sale of personal property; what not a delivery.*—Where one agreed to sell to another a threshing-machine which had been loaned to, and was in the possession of a third party, and gave to the purchaser an order on the party in possession for the machine, the purchaser executing his note for the purchase-money,—*held*, in the absence of proof that the parties so intended, that this did not constitute a delivery of the machine, or vest the title thereto in the purchaser.

2. *Same.*—To constitute a delivery in such case, the party in possession must deliver the machine, or consent to attorn to the purchaser so as to become his bailee.

[Edwards, Hudmon & Co. v. Meadows.]

3. *Same; waiver of delivery.*—If the purchaser in such case voluntarily consents to let the party in possession retain the machine for a definite period of time, as a matter of favor, this will operate a waiver of the delivery; but no such waiver can be implied from the fact, that the purchaser, acting under the moral coercion of necessity dictated by the situation, as where the bailee refuses to deliver until he has finished a certain amount of work, or agrees to deliver only after he has finished the work, merely submits to the bailee's continued possession as the best arrangement he can make under the circumstances. The party in possession does not thereby become the bailee of the purchaser, but he continues his original custody of the machine as the bailee of the vendor.

4. *Notice of sale under power contained in a mortgage; what sufficient.* Posting a notice of sale at the court-house door, and another at the post-office, in the city of Opelika, is a strict compliance with a power of sale contained in a mortgage, which required that the sale should be advertised by posting notices thereof "in two public places in Lee county."

APPEAL from Lee Circuit Court.

Tried before Hon H. D. CLAYTON.

This was a suit on a promissory note by Edwards, Hudmon & Co. against T. C. & J. Meadows, and was commenced on September 20th, 1881. The defendants pleaded (1) "that the consideration of the note sued on had failed," and (2) that said note was given for a threshing-machine which the defendants purchased, without seeing, it then being in the possession of one Bascom Brooks; that the machine was warranted to be in good condition in every respect, but when it was tendered to defendants, it was broken and in no respect sufficient for threshing grain, and that thereupon they refused to receive, and never did receive the same. Two other pleas were also filed, alleging a warranty of the machine, and a breach thereof, one of which was pleaded in bar, and the other claimed damages resulting from the breach of the warranty by way of set-off. From the judgment-entry it appears, that the cause was tried on issue joined on the pleas above stated.

The evidence introduced on the trial tended to show, that J. Meadows, acting for defendants, applied to the plaintiffs, who resided and did business in Opelika, in this State, in the summer of 1879, to purchase a threshing-machine. The plaintiffs showed him the only machine they then had, stating the price. Meadows, after examining the machine, remarked that he was not then ready to purchase, but that he would write from Salem by the afternoon's mail whether he would take it, requesting the plaintiffs not to sell until they heard from him; but to this the plaintiffs replied that they could not hold the machine, but would sell to the first purchaser they found. Meadows then left, and shortly afterwards the plaintiffs loaned the machine to one Brooks to be used by him until another machine, which they had ordered for him, arrived. Meadows on the same day wrote to plaintiffs from Salem, that he would take the machine, and on the morning of the following day he returned

[Edwards, Hudmon & Co. v. Meadows.]

for the machine, when he was informed of the loan to Brooks, the plaintiffs further stating that they expected Brooks' machine in about ten days. Meadows returned for the machine about ten days afterwards, when the plaintiffs, having information leading them to believe that the machine ordered for Brooks would arrive that night, agreed to give to Meadows an order for the machine which they had loaned Brooks, which was done; and thereupon the said Meadows, in the name of the defendants, executed the note sued on, and also another note for $70, and also a mortgage on the machine to secure the last mentioned note. This mortgage was introduced in evidence, and contained a power authorizing the plaintiffs to take possession of, and to sell the morgaged property at public outcry, after "advertising for ten days by posting written notices in two public places in Lee county." Meadows took the order and delivered it to Brooks, who was then engaged in threshing wheat for one Harvey about six miles from Opelika. There was some conflict in the evidence as to what took place between Meadows and Brooks after the order was delivered. The evidence for the defendants tended to show, that Brooks on reading the order, said that "he did not know how about it," and afterwards said that Meadows "could not get the machine until he had threshed Harvey's grain, which he could do in a very short time;" that with this understanding Meadows went home, and returned on the next morning with a wagon to get the machine; that he found Brooks threshing wheat with the machine, and that Brooks then told him that "he had reconsidered the matter, that he had the dead-wood on them, and that he would not let Meadows have the machine unless they [the plaintiffs] furnished him another;" that after this, and while Meadows "was waiting," a crank-shaft of the machine was broken, and Brooks thereupon sent an order to the plaintiffs for a new one. The testimony of Brooks, who was examined on behalf of the plaintiffs, tended to show, that, on reading the note from plaintiffs, he told Meadows that if he would allow witness to finish Harvey's wheat, which he could do in a few hours the next morning, witness would let him have the machine; that Meadows returned on the following morning for the machine, and that while witness was engaged in threshing Harvey's wheat, and while Meadows was waiting for the machine, a crank-shaft was broken. This witness further testified that the shaft could have been easily replaced with another at a small expense.

After the shaft was broken, as the evidence further tended to show, Meadows returned to the plaintiffs, told them what had occurred, and asked Edwards, one of the firm, whether "they did not intend to make some reduction, which Edwards refused to do," referring Meadows to the other plaintiffs with

[Edwards, Hudmon & Co. v. Meadows.]

whom he had made the trade.  "Some time afterwards," Meadows went to the office of the plaintiffs' book-keeper, and "asked to let him see the notes and mortgage he had given," and when they were handed to him, he said to the book-keeper that "he believed he would take them up."  The book-keeper asked him whether he meant that he would pay the notes, to which Meadows replied, "no, I believe I will not take the machine." The book-keeper then demanded a return of the papers, and Meadows having refused to deliver them, they were taken from him by force.  After the law-day of the mortgage, the plaintiffs took possession of the machine, and, after advertising the same for sale by posting written notices for ten days at the court-house door and at the post-office in the city of Opelika, they sold it at public outcry under the power contained in the mortgage; and at the sale they bid it in for $100, which was shown to have been its fair value; and after paying the note for $70, they applied the balance in part payment of the note sued on.  It is not shown in whose possession the machine remained after Meadows refused to take it.  This was the substance of the evidence introduced on the trial bearing on the questions raised by the bill of exceptions.

The court, in its general charge, instructed the jury, among other things, as follows: 1.  "That if, at the time Meadows received the order, it was not accepted by him as an actual delivery of the machine, but simply as a means of getting it, there was not, at the time of such acceptance of said order, an actual sale, and plaintiff can not recover."  2.  "Tl at the title to the machine did not pass to defendants at the time of their accepting the order therefor, unless the plaintiffs were able and willing to deliver the machine to the defendants, or the order was accepted as a delivery."  3.  "That if, when Meadows presented the order to Brooks, the latter refused to deliver the machine to him, the plaintiffs can not recover, unless said Meadows waived the delivery, or unless the title passed to defendants at some other time."  4.  "That if, when Meadows presented the order to Brooks for the machine, Meadows acquiesced in Brooks' retaining the machine until some time the next day, and, in the meantime, to thresh with it, but did not so acquiesce voluntarily, but only because it was the best he could do, and as a means of afterwards getting the machine, then there was no delivery, and the plaintiffs can not recover, unless Meadows had waived the delivery."  5.  "That, if from the evidence the jury find that the title to the machine never passed into the defendants, the plaintiffs can not recover." 6.  "That the posting of notices, one at the court-house, and one at the post-office in the city of Opelika, was not a strict compliance with the requirements of the mortgage as to the

place where the notices should be posted; and that unless plaintiffs have showed a strict compliance in that particular, they can not claim the benefits of the sale, but would be responsible for the value of the machine, after it passed into their possession, irrespective of what it was sold for." To each of these instructions the plaintiffs duly excepted.

The jury returned a verdict for the defendant, on which judgment was rendered. The rulings of the court above noted are here assigned as error.

H. C. LINDSEY, for appellants. (1) The evidence shows that every element of an *executed* sale was present; the specific article was designated; there was an agreement for the transfer of the title, and the price was fixed. Therefore, the title passed, and the plaintiffs were entitled to recover, regardless of what became of the machine.—Benj. on Sales, pp. 219, 220; Story on Sales, p. 300, § 289, note 2; 1 Chitty on Con. p. 518; *Tuxworth v. Moore*, 9 Pick. 347; *Bullard v. Wait*, 16 Gray, 55. (2) The notices of the sale under the mortgage were posted in strict compliance with the power of sale contained therein.

W. J. SAMFORD and J. M. CHILTON, *contra.*—(No brief came to the hands of the reporter.)

SOMERVILLE, J.—Where a vendor makes sale of personal property in the custody of a third person, who is his bailee, and gives a delivery order to the vendee, it has long been settled that this will not amount to a delivery so as to vest the title in the vendee, until the order is presented and such third person agrees to become the bailee of the purchaser, expressly or impliedly.—Benj. on Sales, § 175, § 680; *Bentall v. Burn*, 3 B. & C. 423; *Barney v. Brown*, 19 Amer. Dec. 720. It is true that where the custodian or bailee assents in *advance* of the sale to become the bailee of the buyer, this assent might be irrevocable after the sale, and the title would pass. A refusal by the custodian afterwards to deliver would be, not a refusal to *become* bailee, but to *do his duty* as such under the previous agreement which constituted him bailee for the purchaser. Benj. on Sales, § 175. So where goods are merely on the premises of a third person, who is not a bailee for the owner, as in the case of one holding tortious possession, delivery may be effected by the vendor's putting the goods at the disposal of the vendee, so as to be, actually or constructively, under the exclusive dominion of the latter.—Benj. on Sales, § 178.

Brooks in this case was clearly the bailee of the appellants, the machine sold by them to Meadows being in his possession.

[Edwards, Hudmon & Co. v. Meadows.]

The mere giving of the delivery order, without more, did not transfer the title of the property, or amount to a delivery, unless so intended mutually by the parties, and such intention must be evidenced by proper proof, circumstantial or direct. When the order was presented to Brooks, if he had consented to attorn to Meadows so as to become his bailee, the delivery would have been complete.

And so the delivery could have been waived by the purchaser, if he had voluntarily consented to let Brooks retain the machine until the next day, or for any definite space of time, as an act of free grace or favor from himself. But if Meadows acted under the moral coercion of necessity dictated by the situation, and merely allowed Brooks to continue in custody as the best arrangement he could make under the circumstances, Brooks would not thereby become his bailee, but continued his original custody as bailee of the vendors, Edwards, Hudmon & Co.

In *Magee v. Billingsley*, 3 Ala. 679, the giving of an order for cotton stored in a warehouse and in a deliverable condition was held *prima facie* to constitute a delivery. There the warehouseman, however, agreed to attorn to the vendee, and made a memorandum of the purchaser's name on his books in the usual manner of such sales. Custom, too, would probably exert a controlling influence in the case of sales of cotton kept on deposit by warehousemen, especially in large cities, which would take such transactions out of the operation of the ordinary rule governing other classes of bailees and other kinds of property.

The charges of the court in relation to the delivery of the property in controversy were in accordance with these views, and there was no error in them.

The court erred, however, we think, in charging that the posting of one notice at the court-house door, and another at the post-office, in the city of Opelika, was not a strict compliance with the requirement of the mortgage, which was that advertisement of foreclosure should be made by posting written notices "in *two public places* in Lee county." No two places in the entire county could probably have been selected which were more public, or where the attention of more persons would have been called to the intended sale. It would be unreasonable to suppose that separate municipalities were contemplated, or separate localities out of the same municipality.

Reversed and remanded.