WADHAMS *v.* BALFOUR.

[ 51 Pac. 642.]

SALE—PASSING TITLE.—Where it appears that the parties to a transaction intended to sell the chattels involved and to deliver possession of them, it will be held that the title passes thereby, although some other proceeding, such as weighing or measuring, may remain to be done before the final settlement: *Rosenthal* v. *Kahn,* 19 Or. 575, cited.

IMPLIED WARRANTY—SALE BY SAMPLE.—Where goods are sold by sample there is an implied warranty that the bulk, when delivered, will correspond in both kind and quality with the sample.

SALE BY SAMPLE—EXAMINATION AS A CONDITION.—In all cases of sale by sample it is a necessary condition that the vendee shall have an opportunity to examine the goods; this right may be termed a condition subsequent to the sale, in the absence of some special agreement.

IMPLIED WARRANTY.—The term "implied warranty," when used concerning a sale of goods by sample, means something more than is imported by its technical signification; its effect is to attach to the sale a condition, the nonfulfillment of which will avoid the contract at the option of the purchaser, who may rescind it.

32 Or.—21.

SALE—DELIVERY—TITLE.—Where there is a contract to deliver goods cor-- responding with a sample, without other conditions, the title passes whenever goods of the required kind, quality and quantity are deliv- ered into the control of the vendee. No inspection in such cases is. necessary to complete the transaction: *Brigham* v. *Hibbard*, 28 Or. 387, and *Johnson* v. *Hibbard*, 29 Or. 188, cited.

STATUTE OF FRAUDS—DELIVERY.—The delivery of the bill of lading of a car of wheat, by indorsement in blank to the purchaser is a sufficient. delivery to take the transaction out of the satute of frauds.

From Multnomah:   E. D. SHATTUCK, Judge.

Plaintiff, a corporation, sued defendants, a copart-- nership, under the name of Balfour, Guthrie & Com- pany, to recover the contract price of a certain carload of wheat, consisting of 600 bushels, which it is alleged plaintiff sold and delivered to the defendants. The cause having been tried without the intervention of a. jury, the court made, among others, the following find-- ings of fact:   " (2) That on the nineteenth day of Sep- tember, 1894, the plaintiff was the consignee of 270 sacks of wheat loaded on car No. 41,796 of the Union Pacific Railroad Company, said car being then in the. service of the receiver of the Oregon Railway & Navi- gation Company; and plaintiff was in possession of a. regular bill of lading showing that said wheat had been received at Yoakum Station from D. Kemler on the thirteenth day of September, 1894, for delivery to the plaintiff, as consignee, at Portland, Oregon, and also showing that the weight of said wheat, subject to cor- rection, was 36,000 pounds, contained in 270 sacks." "(3) That along with said bill of lading the plaintiff was also in possession of what purported to be a sam- ple of said wheat, sent to the plaintiff by its consignor; and, on the nineteenth day of September, Leo Fried,

the secretary of plaintiff, acting on its behalf, called upon the defendants, represented in the transaction by one J. S. Patterson, their purchasing agent of grain, exhibited his sample, which was inspected by said Patterson, and offered to sell the carload of wheat, and thereupon the defendants offered to pay plaintiff forty-two cents per bushel; that said offer was accepted, and the plaintiff indorsed the bill of lading in blank, and delivered it, along with the sample, to the defendants; that the intent of plaintiff in indorsing and delivering the bill of lading was to transfer, as vendor, to the defendants, as purchasers, the possession and control of the wheat thereby represented; and the intent of the defendants in taking said bill of lading was to accept and receive possession of said wheat as purchasers of the same." "(9) That by the indorsement and delivery of the bill of lading, and the negotiations as aforesaid had between the plaintiff and defendants touching the sale and purchase of said wheat, the legal title thereof passed to, and was vested in, the defendants, on the nineteenth day of September, 1894, and thereafter, at the time of its destruction."

For further elucidation, brief reference is made to the testimony adduced. Mr. Fried, plaintiff's principal witness, testified that he was the secretary of the plaintiff; that Kemler sent several samples of wheat, which he submitted to buyers in the City of Portland (among others, to Mr. Patterson, who was the buyer for Balfour, Guthrie & Company); that Patterson made him a bid for defendants of forty-two cents, which was the best he had had; and that he sold to

them. He says: "The quantity was one carload. represented by 270 sacks. I think that is the number, These specimens of wheat were shown to those buyers, so that they could distinguish between the different classes of wheat; also to show them what kind of wheat this was. This sample I showed Mr. Patterson was a sample of Blue Stem wheat. He looked at it, and offered me forty-two cents for this car, here in the city. * * * He said: 'When you get the bill of lading, we will take charge of it. We will pay the freight, and take charge of it.' That is what we did on the nineteenth of September last." He further testified, in effect, that the shipping receipt was indorsed by him, and delivered to Balfour, Guthrie & Company, in conformity with the contract to sell them the car of wheat, and that his purpose in delivering the receipt was "to deliver the wheat to them, to give them the control of the wheat." Touching the ascertainment of weights, he says: "We have a bill of lading governing the weights, which Balfour, Guthrie & Company have always accepted. When they made their returns, if there was a correction, they made them, and we accepted their returns. If there was one or two or five sacks of wheat they objected to, they would report it, and we would allow it. And also what they reported on the other hand we accepted that also. * * * Their terms were no different in this case from what they had been before. They accepted our bill of lading, and took charge of the wheat, and we accepted their returns. Sometimes there was a variation in the weight; sometimes, a reduction. We had to accept their returns, because we

could not afford to contend for it.   *   *   *   We accepted their weights." Patterson, testifying for the defendants, says: "A sample was presented to me by Wadhams & Company, alleged to represent the car of grain which I bought from them on that representation, at forty-two cents per bushel.   *   *   *   The quality was to be according to the sample shown. *   *   *   We do business to a large extent upon grain that is to come up to a particular standard.   In this instance the grain had to come up to a particular sample, which could not be determined by us until the wheat had been unloaded from the car.   Whether or not this sample represented the contents properly could not be determined until the wheat was unloaded.   *   *   *   All purchases made by us are passe1 upon the Portland weight, grade and inspection. That is what I refer to when I say 'our usual terms.'" Later he testified, in effect, that the statement that the wheat was to correspond with the sample was made to indicate their usage, and not that it was directly iterated in that transaction.   The car arrived at the Albina yards of the railroad company on the nineteenth of September, the same day the negotiations took place; and on the twentieth the shipping receipt was transmitted by defendants to the local freight agent of said company, who was instructed to have said car switched to Montgomery Dock, and the railroad company gave directions accordingly.   Owing to a rush of work at the freight yards, the car was not switched to Montgomery Dock, but was consumed, with it contents, by fire, on the twenty-third.   Judgment for plaintiff, and defendants appeal.

AFFIRMED.

For appellants there was a brief over the names of *Williams, Wood & Linthicum,* and *J. Couch Flanders,* with an oral argument by *Mr. Geo. H. Williams.*

For respondent there was a brief over the name of *Cox, Cotton, Teal & Minor,* with an oral argument by *Mr. Wirt Minor.*

MR. JUSTICE WOLVERTON, after making the foregoing statement, delivered the opinion.

The pivotal question is, in whom did the title to the carload of wheat rest at the time it was consumed? The action is for the purchase price of wheat sold and delivered, and if there was no delivery, so as to pass title, there can be no recovery; and of this we must inquire. The court below found that the title passed by the indorsement and delivery of the bill of lading. This, however, is a conclusion of law, and must be deduced from the findings of fact. Defendants contend that such a conclusion does not follow from the facts found. Was the contract entered into by the parties a mere executory agreement, or was it in reality a bargain and sale of the wheat in question? If the former, the wheat was at the risk of the seller; but if the latter, the risk was with the buyer. In determining whether the contract passed the title, the primary consideration is the intention of the parties thereto. If the intention is manifested clearly and unequivocally it controls. But it is not infrequently the case that parties have expressed their intention imperfectly, and have left the matter in doubt as to

what they really meant should be the effect of their engagements in the premises. In such cases, resort must be had to certain rules of construction applied by the courts. A presumption of law prevails that if something remains to be done for the purpose of testing the property, or fixing the amount to be paid, by weighing, measuring, or the like, or of putting the property into condition for final delivery, the title does not pass until the act is done. The presumption may, however, be overcome, and the intention of the parties will prevail, as against it: 21 Am. & Eng. Enc. Law (1st Ed.), 479. There exists also a counter presumption that where the specific thing is agreed upon, and is ready for immediate delivery, the contract is an actual sale, and transfers title at once, and it has been held that the seller waives the condition of cash payment when he makes complete delivery without expressly reserving title in himself. MITCHELL, J., in *Fishback* v. *Van Dusen,* 33 Minn. 117 (22 N. W. 245), says: "The doctrine is uniform and well established that if the vendor unqualifiedly and unconditionally delivers the goods to the vendee, without insisting on performance of conditions, intending to rely solely on the personal responsibility of the vendee, the title passes to the latter, and the vendor cannot afterwards reclaim the property," — citing many cases, among them *Upton* v. *Sturbridge Cotton Mills*, 111 Mass. 446; *Freeman* v. *Nichols*, 116 Mass. 309; *Mixer* v. *Cook*, 31 Me. 340. In *Rosenthal* v. *Kahn*, 19 Or. 575 (24 Pac. 991), Mr. Justice BEAN says: "If the goods sold are sufficiently designated, so that no question can arise as to the thing intended, it has been held not

absolutely necessary that the goods should be in a deliverable condition, or that the quantity or quality, when the price depends upon either or both, should be determined. All these circumstances have an important bearing in arriving at the intention of the parties, but no one of them or all combined are conclusive." And WAGNER, J., in *Ober* v. *Carson*, 62 Mo. 213, says: "Where anything remains to be done between the seller and the purchaser before the goods are to be delivered, as separating the specific quantity sold from a larger mass, or identifying them when they are mixed with others, a present right of property does not attach in the purchaser. But when a mere operation of weight, measurement counting or the like remains to be performed after the goods are actually delivered, and it is shown that it was the intention of the parties to complete the sale by delivery, such weighing, measuring or counting afterwards will not be regarded as a part of the contract of sale, but will be considered as referring to adjustment on a final settlement. The question of transfer to, and vesting title in, the purchaser always involves an inquiry into the intention of the contracting parties; and it is to be ascertained whether their negotiations and acts show an intention on the part of the seller to relinquish all further claim as owner, and on the part of the buyer to assume such control with all liabilities." See, also, *Cunningham* v. *Ashbrook*, 20 Mo. 554.

In *Fletcher* v. *Ingram*, 46 Wis. 201 (50 N. W. 425), ORTON, J., speaking for the court and affirming *Sewell* v. *Eaton*, 6 Wis. 490 (70 Am. Dec. 471), says: "That if it clearly appear to have been the intention of the

parties that the property should be deemed to be delivered and the title to have passed, and especially if their acts be inconsistent with any other view, the mere fact that something remains to be done will not govern such intention." In *Bryans* v. *Nix*, 4 Mees. & W. 789, a case of perceptible analogy to the one at bar, it was held that " if the intention of the parties to pass the property, whether absolute or special, in certain ascertained chattels, is established and they are placed in the hands of a depositary, no matter whether such depositary be a common carrier, or shipmaster employed by the consignor, or a third person, and the chattels are so placed on account of the person who is to have that property, and the depositary assents, it is enough; and it matters not by what documents this is effected." See, also, *De Wolf* v. *Gardner*, 12 Cush. 19 (59 Am. Dec. 165); *Somers* v. *McLaughlin*, 57 Wis. 358 (15 N. W. 442). It is said in *O'Keefe* v. *Kellogg*, 15 Ill. 352, that " where anything remains to be done to complete the contract, such as ascertaining the quantity and the delivery of possession, the title does not pass till the contract is thus completed, while the title may pass when the contract is completed, although something may remain to be done under the contract in order to ascertain the amount to be paid by the purchaser. In such a case, if the possession is delivered under the contract, and such is the intention of the parties, the title may pass, although the quantity is subsequently to be ascertained." This latter authority is but another form of distinguishing between the executory agreement and the completed sale. If, by the terms of the agreement, anything remains to be done

which is requisite to the identification of the specific chattels, or is made essential to the ascertainment of the quantity or quality, so as to determine and fix the price to be paid, or which has regard to a specific manner of delivery and acceptance, the sale is executory, and no title passes until the essentials are performed. But many things which are often made essential by the parties in an executory agreement to sell may become nonessentials after delivery; that is to say, many provisions (and these may be expressed or implied) which are impressed by the contract with the quality of conditions precedent in the one case are regarded as conditions subsequent in the other. So it is where there has been an unconditional delivery of the specific property and something remains to be done, as measuring, weighing and the like, for the purpose of ascertaining the price at the rate agreed upon; these things become and are regarded as conditions subsequent, and the title will pass with the delivery: *Crofoot* v. *Bennett*, 2 N. Y. 258; *Burrows* v. *Whittaker*, 71 N. Y. 291 (27 Am. Rep. 42); *Graff* v. *Fitch*, 58 Ill. 373 (11 Am. Rep. 85); *Macomber* v. *Parker*, 13 Pick. 175; *Riddle* v. *Varnum*, 20 Pick. 280.

But it is contended that the transaction involved is technically a sale by sample; that such a contract is purely executory; and that title to the wheat did not pass, because there had been no opportunity afforded the purchaser in the ordinary course of business for inspection to determine whether it was of the kind and quality as represented by the sample exhibited. "A sale by sample," says DICK, J., in *Reynolds* v. *Palmer*, 21 Fed. 435, "is where a small quantity of

any commodity is exhibited by the vendor as a fair specimen of a larger quantity, called the 'bulk,' which is not present, and there is no opportunity for a personal examination. To constitute such sale it must appear that the parties contracted solely with reference to the sample, and mutually understood that they were so dealing in regard to the quality of the bulk": *Day* v. *Raguet*, 14 Minn. 273. And the question whether the sale is by sample is always one of fact for the jury, to be determined by all the circumstances of the case, with a view to the ascertainment of the intention of the parties respecting the transaction: *Beirne* v. *Dord*, 5 N. Y. 95, 99 (55 Am. Dec. 321). The findings of the court, we may assume, have fixed the character of the transaction as a sale by sample. It is said to be a general rule that in all sales of goods really by sample there is an implied warranty attending the transaction that the bulk is equal in quality to the sample exhibited: Benjamin on Sales (Bennett's Ed.) § 648, and American Notes, p. 641, subd. 14; 2 Schouler on Personal Property, § 360. The rule is stated broader by some authorities. Mr. Story says: "A warranty is implied that the bulk corresponds to the sample in nature and quality": Story on Sales, § 376. Mr. Lawson says in a note to *Reynolds* v. *Palmer*, 21 Fed. 454: "It is laid down in a large number of cases, and may be considered as well settled law, that on the sale of goods by sample there is an implied warranty that the goods sold shall be equal in quality as well as of the same kind as the sample produced." Chancellor Kent says: "Such a sale amounts to an implied warranty that the article is in bulk of the

same kind and equal in quality with the sample ":    2
Kent's Commentaries, *481.    Pennsylvania holds to a
modified rule which limits the implied warranty to
the species or kind, and inhibits its application to
quality, which rule is supposed to be an exception to
the one obtaining elsewhere:    *Boyd* v. *Wilson*, 83 Pa.
St. 319 (21 Am. Rep. 176), and American Notes to
Benjamin on Sales, § 648; Tiedman on Sales, § 188;
*Bradford* v. *Manley*, 13 Mass. 139 (7 Am. Dec. 122)·
So, in *Pope* v. *Allis*, 115 U. S. 372 (6 Sup. Ct. 69), it is
said that the sale "amounts to an undertaking on the
part of the seller with the buyer that all of the goods
are similar, both in nature and quality, to those ex-
hibited; and, if they do not correspond, the buyer
may refuse to receive them, or, if received, he may
return them in a reasonable time allowed for exam-
ination, and thus rescind the contract."

We take it that the broader acceptation of the rule
is, under the authorities, the better one, and that the
implied warranty is both of the kind and quality.
Necessarily, there is a condition attending such a
transaction that the buyer shall have a reasonable and
fair opportunity of comparing the bulk with the
sample, and of determining therefrom for himself
whether or not it is really of the same nature and
quality as represented.    This condition may be re-
garded as fundamental, and absolute acceptance on
the part of the buyer cannot be expected or enforced
without he be given or may have exercised such
privilege.    Technically considered, a warranty is a
collateral or independent undertaking, for a breach of
which the remedy sounds only in damages; but a con-

dition is of the very essence of the contract. If prece-
dent, there is a remedy by repudiation; if subse-
quent, one exists by rescission, and these avoid the
contract. COCHRAN, J., in *Gunther* v. *Atwell,* 19 Md.
157, says: "Strictly speaking, a contract of sale by
sample is not a warranty of quality, but an agreement
of the seller to deliver, and the buyer to accept, goods
of the same kind and quality as the sample. The
identity of the goods sold in kind, condition, and
quality with that of the sample is of the essence of
the contract; and, where the goods sold do not corres-
pond with the sample, there would seem to be no per-
formance of the contract." In *Beirne* v. *Dord,* 5 N. Y.
95 (55 Am. Dec. 321), it is held that, "when a contract
for the sale of goods is made by sample, it amounts to
an undertaking on the part of the seller with the pur-
chaser that all the goods are similar both in nature
and quality to those exhibited; and, if they be not,
the purchaser may either rescind the contract by
returning the goods in a proper time, or keep them,
and recover damages for the breach of such warranty."
To the same effect is *Pope* v. *Allis,* 115 U. S. 372 (6
Sup. Ct. 69), and *Jones* v. *George,* 61 Tex. 345. So in
*Morse* v. *Brackett,* 98 Mass. 209 (48 Am. Rep. 280), it is
held that a sale of personal property with warranty
may be treated as a sale upon condition subsequent,
at the election of the vendee, who may rescind the
sale, and return the property upon a breach of the
warranty. Mr. Russell, in 10 Am. & Eng. Enc. Law
(1st Ed.,) 165, says: "In a sale by sample there is
usually an implied warranty—more properly, a con-
dition precedent—that the bulk of the goods, when

delivered, shall conform to the sample by which the sale is made in kind, character and quality." And Mr. Tiedeman has reached the conclusion that the implied provision for correspondence of the bulk with the sample or description operates both as a condition and as a warranty: Tiedeman on Sales, §§ 197,215. Such is certainly the effect of the authorities when the remedies which are applied and held pertinent are taken into account.

The implied warranty is effective to defeat the sale if the contract is executory, as a breach in the delivery of goods of the kind and quality indicated by the sample will furnish a justification or defense for refusing to accept them:   Tiedeman on Sales, § 180; *Morse* v. *Stockyard Company*, 21 Or. 289 (14 L. R. A. 157, 28 Pac. 2).   So, also, is it effective after delivery has been made or the purchase price paid, and the sale has become executed, as affording ample cause for returning the goods and rescinding the contract, and thus avoiding the sale.   The purchaser may thereupon sue for the purchase price, as well as for damages, for a noncompliance with the implied undertaking: *Wolcott* v. *Mount*, 36 N. J. Law, 262 (13 Am. Rep. 438); *Gunther* v. *Atwell*, 19 Md. 157; *Beirne* v. *Dord*, 5 N. Y. 95 (55 Am. Dec. 321); *Pope* v. *Allis*, 115 U. S. 372 (6 Sup. Ct. 69).   It is but a natural and just inference from such a contract that the seller is bound to deliver that which he has promised, or, having assumed to perform, that he has produced in kind and quality such as he has undertaken should be produced, and, if he has done neither of these, he has not performed. To use the illustration of Lord Abinger:   "If a man

offers to buy peas of another, and he sends him beans, he does not perform his contract. But that is not a warranty. There is no warranty that he should sell him peas. The contract is to sell peas, and, if he sells him anything else in their stead, it is a nonperformance of it": *Chanter* v. *Hopkins*, 4 Mees. & W. 399. To extend the illustration, the delivery of damaged or decayed peas would not be a fulfillment of an undertaking to deliver sound ones. That which is delivered is not the same article as the one offered, and, unless there is identity in kind and quality, the purchaser is not bound to accept. This condition is of the very essence of the contract, and is precedent to any obligation on the part of the purchaser to pay: *Pope* v. *Allis*, 115 U. S. 372, (6 Sup. Ct. 69), and 2 Schouler on Personal Property, § 316. The plaintiff offered a specific carload of wheat. This he represented by the sample to be of a certain superior species, known as "Blue Stem." Now, if it should transpire that the car contained barley instead of wheat, it would not be contended that the transaction effected a sale of the barley; and so, if the wheat should be of the Chili Club, or some other distinct variety, or of an inferior quality, it could not be more effective for the purpose. So that the implied warranty is something more than the term imports by its technical signification, and its effect is to subjoin a condition the nonfulfillment of which will void the contract at the option of the purchaser, who may place the goods at the disposal of the seller, and thereby rescind it. Previous dealings of the parties, if considered, are in exact harmony with the idea of an implied warranty, pure and simple, as

the plaintiff has accepted the returns of the defendants without question.

Now, as to the question of title: The rule is such that, if the seller fully performs by a delivery of goods of the kind and quality agreed upon, the property therein passes at once to the purchaser, as in such case he would have no right to refuse to accept them. The principle is recognized in *Boothby* v. *Plaisted*, 51 N. H. 436 (2 Am. Rep. 140). The case made there was that the agent of plaintiffs, a New York firm, called upon the defendant, in Portsmouth, with samples of liquors; and the defendant ordered such as he desired, but it was agreed that, when the liquors arrived at the store of the defendant, he might examine them, and, if not according to sample, he need not accept them. The defendant left it with the agent to select the line of transportation for the liquors from New York to Portsmouth, but paid the freight. SARGENT, J., speaking for the court, said: "Here was a contract for sale and delivery in New York of a certain description of goods as per sample. If the plaintiffs performed their part of the contract fully by delivering at the time and place agreed the article which they agreed to furnish, then it became at once the property of the defendant, and he would ordinarily have no right to refuse to accept it." Hence, it was held that the sale was completed in New York and not in New Hampshire. As in harmony with this view, see *Magee* v. *Billingsley*, 3 Ala. 698; *McCarty* v. *Gordon*, 16 Kan. 35, and *Gill* v. *Kaufman*, 16 Kan. 571. This court has recognized the same principle in *Brigham* v. *Hibbard*, 28 Or. 387 (43 Pac. 383), wherein

Chief Justice BEAN says: "Where the contract itself is valid a delivery pursuant to its terms at the place and in the manner agreed upon, if the goods conform to the contract, will sustain an action for goods sold and delivered, without any formal acceptance by the buyer. * * * The buyer has a reasonable time after the delivery in which to examine the goods, and, if they are not of the kind and quality ordered, he may refuse to accept them, and thereby rescind the contract; but this right does not prevent the title from passing, nor a recovery by the seller in an action for goods sold and delivered, if in fact they do conform to the terms of the contract." This case is followed in *Johnson* v. *Hibbard*, 29 Or. 188 (54 Am. St. Rep. 787, 44 Pac. 288), wherein it is said: "But, in order that the title may pass at this juncture of the transaction, the goods must conform as to quantity and quality with the specifications of the order. If they did not so correspond, then an acceptance by the purchaser would be necessary to complete the sale; otherwise, not." These cases were concerning goods to be manufactured to correspond to sample, and it was determined that the delivery to the carrier selected by the consignee was a delivery to the consignee himself. Hence, we take it that, if the conditions of the contract touching the kind, quantity and quality of the personal property contracted to be delivered comports with the undertaking in this regard, the title passes with delivery where no other conditions are imposed, and that acceptance in such instance is not a condition precedent thereto. The condition precedent consists in a delivery of the kind, quantity and quality speci-

fied; not in the acceptance, unless some particular manner of acceptance is agreed upon, and the passing of title is made to depend upon that specific performance. But a specification of this latter nature does not attend the ordinary sale by sample.

The right of inspection is a condition of the contract, but whether it is precedent or subsequent depends in a great measure upon the terms of sale. If the title has passed, it is subsequent; and perhaps, in any event, under ordinary circumstances, the buyer must be accorded the privilege before he can be required to pay. But, like other sales, a sale by sample depends largely upon the intention of the parties, as it concerns the passing of the title; and while the circumstance of the right of inspection and acceptance constitutes an element of the contract, and may be considered in determining the intention of the parties, it is not always controlling. The finding of the court touching the intention of the parties in this regard is explicit. It is " that the intent of the plaintiff in endorsing and delivering the bill of lading was to transfer as vendor to the defendants, as purchasers, the possession and control of the wheat thereby represented; and the intent of the defendants in taking said bill of lading was to accept and receive possession of said wheat, as purchasers of the same." Now, as a result of the views herein expressed, and this finding, if the wheat thus delivered was of the kind and quality as represented by the sample, there is no doubt but that the sale was executed, and that the title to the property passed to the purchasers, if the indorsement and transfer of the shipping receipt constituted

a delivery thereof; and as the loss, when the property is destroyed, must fall upon him who is the owner, it would consequently fall upon the defendants. As a logical deduction, the defendants might have defeated the action if it had been made to appear that the wheat was not in kind and quality as represented by the sample; but this question was waived, and they have relied exclusively upon the right of inspection and acceptance as a condition precedent to the right of recovery. In this case, by the passing of title, the condition became a condition subsequent; and, the property having been lost, the opportunity for examination and acceptance has become impossible; but, the title having passed, the loss must fall upon those with whom it vests, and hence the duty to pay for that which has been lost.

A delivery may be constructive, such as a delivery of the key to a warehouse or depository wherein the goods are kept or stored, or it may be by a transfer and indorsement of a warehouse receipt for the goods, or bill of lading showing their shipment and consignment. This is so elementary that it seems scarcely necessary to cite authorities. In *Webster* v. *Granger*, 78 Ill. 230, it is held that where goods in the hands of a carrier are sold by sample, and a delivery ticket, in the form of an order, by the proper railroad or station agent, to deliver the goods therein described to the person therein named as bearer, is delivered to the purchaser with a sample, the title of the goods is thereby completely vested in the purchaser; and, if they are afterwards destroyed, it is his loss, and he is liable for the price agreed upon. See, also *Michigan*

*Central Railroad Company* v. *Phillips*, 60 Ill. 190; *Gibson* v. *Stevens*, 49 U. S. (8 How.), 383; 2 Kent's Commentaries, *500. Such a constructive delivery is sufficient to take the case out of the statute of frauds. Chancellor Kent says: "We think the common law very reasonably fixes the risk where the title resides; and when the bargain is made, and rendered binding by giving earnest or by part payment or part delivery, or by a compliance with the requisitions of the statute of frauds, the property, and with it the risk, attaches to the purchaser": 2 Kent's Commentaries, *499. In the present case the wheat was consigned by bill of lading or shipping receipt by Kemler to the plaintiff. This was plaintiff's evidence of title, and this he indorsed and transferred to defendants, with the sample of wheat exhibited; and with these they assumed full and complete control of the wheat, and thenceforth directed its disposal. Such a delivery was evidently as good and complete as the circumstances of the case would admit, and was sufficient to pass the possession and title, and satisfied the statute. See, also, *Remick* v. *Sandford*, 120 Mass. 309, 316; *Cunningham* v. *Ashbrook*, 20 Mo. 554; *Somers* v. *McLaughlin*, 57 Wis. 358 (15 N. W. 442). These considerations affirm the judgment below, and it is so ordered.

AFFIRMED.