CHARLES H. GARDINER *vs.* WALTER G. DAVIS et als.

Somerset. Opinion March 29, 1913.

*Acceptance. Breach of Contract. Canning. Corn. Damages. Delivery. Degrees. Effect of Frost on Corn. Fact. Frost. High Land. Low Land. Time. Unsuitable for Use.*

1. In this action to recover damages for breach of contract in refusing to accept a quantity of sweet corn grown by the plaintiff for the defendants, the burden was on the plaintiff to prove that his corn was suitable for canning purposes.

2. Upon the evidence in the case, it is held that a breach of the contract on the part of the defendants is not shown.

On motion by the defendants. Motion sustained. New trial granted.

This is an action of assumpsit to recover damages on account of a refusal of the defendants to accept sweet corn planted by the plaintiff for the defendants in accordance with a contract in writing between the parties for the season of 1911. The corn was to be delivered by plaintiff to defendants at their canning plant in Skowhegan. The defendants refused to accept the corn on the ground

that it was not suitable for canning purposes. Plea, the general issue and brief statement. The jury returned a verdict for the plaintiff for $101.17, and the defendants filed a general motion for a new trial.

The case is stated in the opinion.

*Merrill & Merrill,* for plaintiff.

*W. M. Bradley, and Forrest Goodwin,* for defendants.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, HALEY, JJ.

WHITEHOUSE, C. J.   In this action the plaintiff seeks to recover damages for an alleged breach of contract on the part of the defendants in refusing to accept and pay for a quantity of sweet corn grown by the plaintiff for the defendants, who were co-partners doing business under the firm name of the Portland Packing Company. The contract between the parties is in writing and contains the following provisions:

"Each of said subscribers will, during the season of 1911, plant with sweet corn raised from seed to be furnished by said Portland Packing Company, at $4.00 per bushel, and properly cultivate the quantity of land set against his name, and no more, and will, when the corn is in a green state, and in a suitable condition for canning, or at any time when ordered so to do, gather and deliver the corn at the Company's cannery at Skowhegan.

"Each of said subscribers hereto agrees to deliver the CORN at the said cannery in a perfectly tender condition, free from dry, tough, or hard ears, and if such ears are delivered, the Portland Canning Co. shall not be liable for the rejection of the entire load of which these ears are a part.

"Each of said subscribers hereby agrees that if he is once notified by man in charge to so deliver his corn, he is to assume all risks and deliver ALL his corn in the condition above specified without further notification."

The quantity of land cultivated by the plaintiff in pursuance of the contract was four acres.

It is not in controversy that prior to September 19, 1911, the defendants accepted 394 bushels of corn delivered by the plaintiff

at their cannery in Skowhegan, and paid for the same according to the contract; and it is not denied by the defendants that they refused to accept the balance of 285 bushels raised by the plaintiff on the land in question. In their brief statement of special matters of defence, they state that "on the 14th day of September, 1911, there was an unusual, severe and unseasonable frost, whereby the corn of the plaintiff was frozen and rendered unsuitable for canning purposes." They accordingly claim that by the terms of their contract, they were under no obligation to accept corn which was not "in a suitable condition for canning."

The jury rendered a verdict for the plaintiff for $101.17, and the case comes to this court on the defendants' motion to set aside the verdict as against the evidence. There are no exceptions pending, and there is no dispute between the counsel of the respective parties in relation to the law applicable to the case. The sole question before the court is one of fact, and that is whether the plaintiff's corn in question, at the time the defendants refused to accept it, "was in a suitable condition for canning," having reference to the nature and purpose of the defendants' whole enterprise and the manner in which their canning business was necessarily conducted.

The defendants maintain fourteen canning factories throughout the corn belt of the State, and have been engaged in the packing of corn for more than thirty years. It is not in controversy that on the night of the 13th, or the morning of the 14th of September, there was an unusually severe frost which affected the growing corn to a greater or less extent throughout the State. But whether the corn grown on land in a given locality was frost-bitten to a degree that rendered it unsuitable for canning, was a question to be determined upon the facts of that particular case; for it is obvious that there may be as many different degrees of frost and qualities and conditions of corn as there are tracts of land. It is therefore necessary to take into consideration, not only the direct testimony relating to the effect of the frost upon the leaves and spindles of corn and the apparent condition of the kernels of corn, during the two or three days after the frost, but the knowledge derived from long experience respecting the chemical changes that take place in corn that has been frost-bitten in different degrees, and canned at varying periods of time after it is struck by the frost. As bearing

upon the probabilities of the severity of the frost and its effect upon the corn, in a given case, it is also important to consider whether the corn was grown on high or low land, and if the weather was clear and cool or cloudy, and warm immediately after the frost; for it is an elementary principle in the science of physics that the atmosphere, rarified and made lighter by warmth, has a universal tendency to rise, while the colder and heavier air takes the lower position to which gravitation entitles it. Hence, it is a matter of familiar experience that the early frosts of autumn are more severe upon the low grounds than upon the neighboring hills, which are not only covered with warmer air, but are more exposed to the winds which prevent its stagnation.

Furthermore, it might not be, and ordinarily would not be possible for the defendants, with the factory operated to its full capacity, to can, in a single day, or in two or three days after a frost, all of the frost-bitten corn that might be offered by the contracting parties.

The plaintiff's corn was growing on low land, about 2½ miles below the village of Skowhegan. In his testimony, he says "It was planted on the intervale, on what is called the Lowe farm by the river. . . . The next morning after the frost I went down to the piece of corn, the first thing, about six o'clock, and examined it. The spindles and the leaves and the outer husks were chilled. I stripped some of the corn down and the inner leaves of the ears weren't frozen any, and the corn apparently was all right. I couldn't see where it had touched the corn. . . . The stalks were all right at that time. . . . The spindles and leaves, as I say, were frozen." On cross examination, he says, "It was a severe frost;" and in answer to the question, "Did you ever know of a frost as heavy as this at that time in the season in your experience," he says, "Well, I don't know as I ever did." He also admits that between Thursday, the morning of the frost, and the Saturday following "there had been some change in the appearance of the leaves and spindles." "They were all bleached," so that the entire field of corn looked whiter. But he says they continued to eat the corn in the family for a week or ten days after the frost as they had before, and "couldn't see any difference." He admits, how-

ever, that he never had any experience in packing corn, and had no knowledge in regard to the effect of frost upon growing corn as far as suitability for canning was concerned.

The plaintiff's testimony in regard to the bleaching of the leaves and husks of the corn, and the use of it on the table after the frost as well as before, was corroborated by his hired man, and by the testimony of a neighbor that the outside of the plaintiff's corn looked white in the field, but "the stalks were straight and green."

No other witnesses were called by the plaintiff. No evidence was offered by him in relation to the chemical change in the corn caused by the action of the frost on the husks of the ear, or the suitability of the corn for canning purposes after it is frost-bitten. The burden was on the plaintiff to prove that his corn was suitable for canning. But he introduced no witness who had ever had experience in packing corn, or had ever tested the quality or condition of frost-bitten corn after it had been canned.

The testimony in behalf of the defendants, in the first place, confirmed that of the plaintiff himself in regard to the severity of the frost Thursday morning, September 14th, showing that water standing in vessels out of doors at the Skowhegan factory was frozen over and the water frozen in the pipes and faucets; and four of the defendants' witnesses testified in substance that the plaintiff's corn turned white within two or three days after the frost struck it.

In regard to the effect of frost on corn used for canning purposes, the defendant Baxter testifies that he has been engaged in the packing business for thirty years, with experience in all departments of the work, and oversight of all the factories in the State; that at the time of the frost he had his headquarters at Newport, and five factories under his immediate supervision; that if mature enough, frost-bitten corn can be packed for 48 and sometimes for 72 hours after a frost; that if the weather was hot, it would have to be packed sooner than if it was lowery and cold; that in his experience three days had been found to be the limit in which frost-bitten corn would be suitable for canning. He also testifies that "You can't tell from the looks of that corn where the frost has hit it,—you can't tell it from any other corn, except from the taste; and

when corn has been struck by frost so that the outer husks turn white and the inner husk is green, the kernel becomes bitter and flavorless, and when put into cans it has a watery, flat appearance, and often turns sour."

Mr. Atwood has been in the employment of the defendants continuously for 23 years; and although he has studied chemistry, he does not claim to be an expert chemist, but testifies from his knowledge derived from his own experience of 23 years. He states that a chemical change begins to take place in the corn at once after it has been struck; but it can be used for a length of time, varying, according to the weather conditions, from 48 to 72 hours,—"usually about 48 hours with safety. Then the sugar in the corn changes to starch, and it becomes flat and tasteless, loses its sweetness, and then from that it becomes bitter." He also states that he never knew any corn that showed frost on the husks that would not turn bitter within from two to four days; that he never saw corn hit so hard by frost in the canning season as to show it on the inner husk; that when it turns bitter in the can it is spoiled for merchantable purposes; that sometimes the acid fermentation will cause a flat sourness in the taste of the corn, when the cans do not swell, and at other times there is a putrid fermentation in which a gas is generated, and the cans swell.

Mr. Chute, foreman of the factory at Skowhegan, has had twenty years' experience in packing corn; and he testifies that he knew the effect of frost upon corn when packed; and he should say that the corn brought in by the plaintiff on the Monday next following the frost on Wednesday night had turned very fast. It had gone bitter and flat, and was unsuitable for canning.

Mr. Eastman has been engaged in canning corn for 25 years, most of the time in factories of his own, and has had experience in canning corn that was frost-bitten. He states that after corn had been struck by a frost it is tasteless, especially if it is a hard frost; and if it is cold enough to freeze the husks, the outside husks and the flags, it would spoil the corn, for him, for canning, even if the frost hadn't gone through the husks, "and the kernel wasn't frozen a mite."

Mr. Grant, a farmer, who has also been engaged in the canning business for seven years, has had experience in canning frost-bitten

corn, as customwork, for other people; but he would never can any of his own to sell. The appearance of good corn in the can should be creamy, nice color and flavor; but frosted corn comes out watery. The sugar separates from the corn in some way and the starch turns to water, and leaves a kind of a hull that doesn't have any taste to it.

Prof. Nehls, chief chemist of the National Canners' Laboratory, testifies that frosted corn, after it is in the can, is unsuitable for use; "it is what we call sloppy, that is, the water tends to separate and it isn't creamy like good corn, and it is extremely bitter;" he would describe it by saying that in contradistinction from being sour, it is bitter, so much as to make it unfit for use. Mr. Pearl, the biologist of the Maine Experiment Station, states that the effect of the frost is to cause the sugar in the corn to turn to starch.

Finally, the defendants introduced testimony from commission merchants to show the reputation for the highest standard of excellence which Maine sweet corn has sustained in the trade, and to explain the effect which the discovery of even a few cans of frost-bitten and inedible corn inevitably has in depreciating the market value of that brand of corn and impairing confidence in the subsequent products of the packer.

In rebuttal, it is insisted that the plaintiff's corn, rejected by the defendants, had all the appearance and characteristics of corn admitted to be suitable for canning, and was in as good condition for canning as the other loads accepted by the defendants at the time they refused to take the balance. It is also suggested by the plaintiff that if any of the frost-bitten corn canned by the defendants fermented and became tasteless or bitter and unfit for food, it was in the power of the defendants to produce a can of it at the trial, as the best evidence of their contention that the corn was not suitable for packing. But there is testimony from the defendants' witnesses showing the ordinary course of business in placing the product of a cannery on the market, and the number of dealers who handle the corn before it reaches the consumer; and it appears from the evidence that a can of frost-bitten corn might not become sour or bitter "for many months" after it is canned, and obviously might not be discovered by the consumer for many months more, and might not be returned to the packer, or a complaint made in regard

to it, for a year or more and sometimes two years after the corn was shipped from the factory. It is not claimed that any cans of defective corn had been returned to the defendants at the time of the trial in March, 1912, and it is insisted that sufficient time had not elapsed after the shipment the autumn before to justify any expectation that such return or complaints would have been made before the trial.

There is no evidence tending to show that in rejecting the plaintiff's corn in question, the defendants were actuated by any other motive than a belief that it was unsuitable for canning. It appears that orders were given by the defendants to accept all corn that was not frost-bitten. They needed the corn contracted for to fill their orders, and there is no evidence that there had been any fall in the market price.

After a careful consideration of all the evidence and arguments of counsel, it is the opinion of the court that there was not sufficient evidence to warrant the conclusion reached by the jury that the corn rejected was suitable for canning at that time. It is the opinion of the court that the evidence fails to show that there was a breach of the contract on the part of the defendants.

The certificate must therefore be,

*Motion sustained.*
*New trial granted.*