## LEWISTON MILLING CO., Limited, v. CARDIFF et al.*

(Circuit Court of Appeals, Ninth Circuit.   July 6, 1920.   Rehearing Denied
September 7, 1920.)

### No. 3400.

1. **Commerce ☞40(1)—Food and Drugs Act not applicable to intrastate sale.**

   The Food and Drugs Act (Comp. St. §§ 8717–8728) has no application to a contract for sale and purchase of a food product to be performed in the state where made, because the purchaser may intend to use the product in interstate commerce.

2. **Trial ☞219—Not necessary for instruction to define commonly understood word "adulterated."**

   An instruction submitting to the jury the question whether a food product was adulterated, within the meaning of Food and Drugs Act, § 7 (Comp. St. § 8723), which is practically identical with Rem. & Bal. Code Wash. § 5455, providing that an article shall be deemed to be adulterated if it contain any added deleterious ingredient "which may render such article injurious to health," *held* not erroneous because it did not define the word "may" as including any possibility of injury; the word having a commonly understood meaning and being so used in the statute.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adulterate.]

3. **Sales ☞179(1)—In sale by sample, acceptance after inspection is conclusive.**

   Where a sale is by sample, and there has been an acceptance after inspection of the commodity, or there has been a reasonable opportunity for inspection, either before or after delivery, to determine whether the commodity conformed to the sample, the sale is concluded, and the purchaser is bound by his contract of purchase.

In Error to the District Court of the United States for the Central Division of the District of Idaho; Frank S. Dietrich, Judge.

Action at law by Ira D. Cardiff and others, partners as Ira D. Cardiff & Co., against the Lewiston Milling Company, Limited. Judgment for plaintiffs, and defendant brings error. Affirmed.

This writ of error is prosecuted by defendant below, and for convenience reference will be made to the parties litigant as plaintiffs and defendant. Recovery is sought of part of the purchase price alleged to be yet due plaintiffs upon a sale to the defendant of dehydrated potatoes. The contract upon which the action is based is in writing, of date March 18, 1918, and by the terms thereof the plaintiffs agreed to sell and the defendant to purchase all of the output of dried, unpeeled potatoes then on hand and to be produced by plaintiffs at their plant, theretofore conducted by the Washington Evaporated Food Company. at Yakima, Wash., from the 1917 crop.  Delivery was to be made at the plant.  Defendant is an Idaho corporation, but was at the time engaged in the operation of a flourmill, also at Yakima.  The potato chips, when delivered, were taken to the defendant's milling plant in Yakima for milling into flour.  Plaintiffs allege performance on their part, and that, on the other hand, defendant refused to receive a large amount of dehydrated potatoes manufactured by plaintiffs under the contract, or wholly to pay for such as had been delivered and manufactured ready for delivery.

The defendant denies that it and plaintiffs entered into a written contract for the manufacture and delivery to defendant of dehydrated potatoes as alleged in the complaint, but alleges affirmatively that, on and prior to March 18, 1918, certain negotiations were had between plaintiffs and defendant, at

Yakima, Wash., upon the subject of manufacturing flour from potatoes, to be used as a substitute for wheat flour, with a view to defendant's entering into a contract with plaintiffs whereby plaintiffs should, at an agreed price, furnish defendant potatoes of the crop of 1917, processed and manufactured in the way of cleaning, slicing into chips, and drying, so that the same would be ready for use by defendant, to be ground and manufactured into potato flour, to be sold by defendant in interstate commerce as food for human beings, and designed to take the place as such of wheat flour to as large extent as possible, to meet the exigencies of the war; that defendant, as a result of such negotiations, agreed to purchase from plaintiffs potatoes of the crop of 1917, to be processed and manufactured, and delivered to defendant for manufacture into flour, and to be sold for food in interstate commerce, the amount so purchased to be limited to such as might be produced within 90 days from February 23, 1918; that it was further agreed "that the product as produced and manufactured and delivered by the plaintiffs to the defendant under such contract should be and would be warranted by plaintiffs as a high quality product, free from the least damage in the processing and manufacturing process to be applied by the plaintiffs, and suitable and marketable for making the best grade of potato flour, and of marketable quality as a food product." It is then further averred, in effect, that the alleged contract set up in the complaint was signed by R. D. Stanley, as manager of defendant, but without authority to execute such contract or agreement in behalf of defendant, and that such contract does not express the real agreement of the parties, as above indicated. Reformation of the contract is sought, to conform to such alleged understanding and agreement.

Defendant asserts that plaintiffs breached the agreement in several particulars, namely: That the potatoes delivered and sought to be delivered were rotten, and contained black, decayed spots, bitter to the taste, which, when ground with the healthy portions into flour, would render the product bitter to the taste; that such potatoes were scorched in drying, giving the flour product a burnt taste and odor, and a red color, thus rendering it unmarketable; that plaintiffs employed filthy and unsanitary methods in drying the potatoes, such as to render them unfit for food; and that in processing them plaintiffs used an excessive amount of sulphur, and thereby further rendered them unfit for food for human consumption. The further defense is advanced that, by reason of the use of sulphur in processing, the potatoes were rendered injurious to health, and therefore adulterated, in violation of the pure food laws of the United States and of the state of Washington, and, further, that such potatoes were misbranded within the meaning of such laws.

The cause went to the jury under the theory that the sale was by sample, resulting in a verdict and judgment for plaintiffs.

James E. Babb, of Lewiston, Idaho, and E. B. Velikanje, of Yakima, Wash., for plaintiff in error.

Orland & Lee, of Moscow, Idaho, and Voorhees & Canfield, of Spokane, Wash., for defendants in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). The first question presented for our consideration is whether the court erred in refusing to instruct the jury, at the close of the testimony, to return a verdict for defendant. Counsel assert insufficiency of the evidence to carry the case to the jury in several particulars, namely: That corporate execution of the written contract is not shown; that the product furnished did not conform to sample; that it appears that the sulphur dioxide used by plaintiffs in processing the potatoes is an added in-

gredient, which may have rendered the article injurious to health; and that the containers of the product sold were not labeled as required by the Food and Drugs Act (Comp. St. §§ 8717–8728).

As it relates to the corporate execution of the agreement, the court instructed that the defense had been abandoned, and that the written contract put in evidence is the contract of the parties. There was no exception reserved to this instruction, and it must be taken to be a true interpretation of the acts of the defendant in the conduct of the trial. Aside from this, a reading of the record lends ample support to the court's position.

The larger question, and the one about which the real controversy hinges, is whether the testimony was sufficient to compel submission to the judgment of the jury touching the use of sulphur dioxide in treatment of the potatoes in the process of dehydration, namely, whether it constitutes a deleterious ingredient, which may have rendered the product injurious to health, in view of the statute of the state of Washington relative to the adulteration of articles of food and drugs. The question is presented in another form by exceptions to failure to give requested instructions in the language employed, and to instructions of the court respecting the same subject-matter.

[1, 2] As a premise to the discussion, in view of the record, it may be affirmed that the United States pure food and drugs legislation does not come into the case, for the reason that the controversy does not involve interstate commerce. The processed potatoes were to be delivered to the defendant at plaintiffs' place of business in Yakima, Wash., and what the defendant may have desired or intended to do with the potatoes when received, whether to deal with them intrastate or interstate, could not affect or otherwise dominate the instant sale or transaction between the parties. We may therefore turn our attention exclusively to a consideration of the question in the light of the local statute. The result must be the same, whether the one or the other statute is applicable, as the statutes themselves are practically alike.

The fifth subdivision of section 7 of the federal Food and Drugs Act (34 Stat. 769 [Comp. St. § 8723]), is practically identical with the fifth subdivision of section 5455, R. & B. Statutes of Washington. By these statutes an article is deemed to be adulterated "if it contain (in case of food) any added poisonous or other added deleterious ingredient which may render such article injurious to health." This clause has received the interpretation of the Supreme Court of the United States in United States v. Lexington Mill Co., 232 U. S. 399, 34 Sup. Ct. 337, 58 L. Ed. 658, L. R. A. 1915B, 774. This case involved the application of the "Alsop process," by which nitrogen peroxide gas, generated by electricity, was mixed with atmospheric air, and the mixture then brought into contact with flour. It was claimed that the process added to the flour product a poisonous or other deleterious ingredient, "which might render the flour injurious to health." After stating that the purpose and intent of the statute was to protect the public health from possible injury by adding to articles of food consumption poisonous and deleterious substances, which might render such articles injurious to

the health of consumers, the court goes on to define the clause "which may render such article injurious to health," as follows:

"The word 'may' is here used in its ordinary and usual signification, there being nothing to show the intention of Congress to affix to it any other meaning. It is, says Webster, 'an auxiliary verb, qualifying the meaning of another verb, by expressing ability, * * * contingency or liability, or possibility or probability.' In thus describing the offense Congress doubtless took into consideration that flour may be used in many ways, in bread, cake, gravy, broth, etc. It may be consumed, when prepared as a food, by the strong and the weak, the old and the young, the well and the sick; and it is intended that if any flour, because of any added poisonous or other deleterious ingredient, may possibly injure the health of any of these, it shall come within the ban of the statute. If it cannot by any possibility, when the facts are reasonably considered, injure the health of any consumer, such flour, though having a small addition of poisonous or deleterious ingredients, may not be condemned under the act."

In view of this rendition of the statute, which is authoritative as well for the interpretation of the state statute, the court having been cited to no different interpretation by the state courts, we may now consider the question heretofore stated.

A large amount of evidence of an expert nature was adduced pro and con as to the supposed deleterious effect that the sulphur dioxide had upon the dehydrated potato product as an article of food. Some of the testimony tended to show that the added ingredient was deleterious, and much of it the contrary, so that there was a direct and persistent conflict respecting the subject-matter of the inquiry. The witness Kimball, after having been advised of the probable, and we might say the possible, amount of sulphur dioxide that went into the product, was very positive that it could not, by any possibility, prove injurious to the health of the consumer. This is his language:

"That dose would not hurt a man, if he took it for 40 years every day. I might add to that—I want to make it plain—that a man takes that amount, more than that amount, into his system every day with his food."

The testimony of other witnesses tends strongly to corroborate him in the statement. So that, under the statute as interpreted by the Supreme Court, there was ample evidence to go to the jury from which they might reasonably infer that the sulphur dioxide, used in the quantity which the evidence tends to show, could not possibly be injurious to health. Such being the case, a directed verdict for defendant plainly would not have been warranted or proper. A further discussion of the evidence upon the subject could only lead into the domain of the jury, wherein there is no necessity to venture.

As it relates to the labeling of the containers of the product, no such duty devolved upon plaintiffs under the statute. The defendant was to furnish the containers, and the product was not to go into general use, except as the defendant might put it upon the market when manufactured into flour at the defendant's plant at Yakima. The plaintiffs, therefore, were not chargeable with a misbranding, and it was not an issue germane to the controversy.

The proposition that the testimony was insufficient to show that the product furnished conformed to the sample is not maintainable, as

there is ample evidence in the record tending to show that it did so conform, and the question was clearly one for the jury.

This brings us to a consideration of whether the question of alleged adulteration was properly submitted to the jury under the instructions of the court. The following requested instruction was not given in the language submitted:

"The court instructs the jury that, in order to defeat plaintiffs' right of recovery, it is not necessary for defendant to show that the sulphur dioxide contained in the potatoes, or that the filthy or decomposed condition of said potatoes, if the jury shall find they, or any substantial portion of them, were decomposed or filthy, would in fact be harmful to health of any person consuming them or the flour or bread product thereof, but it shall be sufficient if defendant shows that it may or might possibly or probably be harmful to health of consumers."

Respecting the same subject-matter, the court gave in its general charge the following instructions:

"It is admitted, gentlemen, that before the contract was entered into Mr. Cardiff, acting for the plaintiff company, knew that the defendant, in contracting for these potatoes, intended to use them for the making of potato flour; so you will assume that to be true. If he knew that, and defendant did not know the process employed in producing the samples, the plaintiff, through Mr. Cardiff, impliedly agreed that the potatoes would not be processed in such a manner as to render them unwholesome or deleterious when used in the intended manner for human food. It is admitted that the sulphur process was employed, and that as a result the chips contain a small percentage of sulphur dioxide or sulphite—not sulphate, but sulphite. The amount naturally varies more or less in the different samples analyzed, but there seems to be little controversy as to the general range of percentages.

"With regard to this, plaintiff contends that the process employed is in common use, and is generally recognized as legitimate and proper, and that in the process of making bread the sulphite is wholly expelled or turned into sulphate, which is entirely harmless, and that, even if carried forward and contained in the bread after it was baked without diminution, the percentage is so small that, when the highest practical amount of potato flour is mixed with the necessary amount of wheat flour, the quantity of the sulphite that a person using such bread would consume in a day is so small as to be negligible, and could not possibly produce harmful results. The contrary position is maintained by the defendant, and the issue is for you to determine. If, under the instructions I am giving you, the plaintiff did impliedly warrant that it would not so process the potatoes as to make them unwholesome or harmful—that is, would not add to them any elements which might, when the flour was used for the making of bread, be harmful or injurious to the consumer—and you find, further, that the product which defendant declined to receive would under some circumstances be harmful, when used for such purpose, or unwholesome, because of such sulphur ingredient, then you should find that defendant was not bound to accept or pay for such products.

"To a large extent the same consideration applies to the issue touching the sanitary conditions obtaining in the plaintiff's plant while the process and processing and the handling were going on. If, as the pleadings admit, plaintiff knew that the defendant was to use the chips for flour-making purposes, it impliedly warranted and promised that the potatoes would be processed under such sanitary conditions as would not render the product unwholesome as an ingredient of food, that nothing would be added to or done with the potatoes which would under the circumstances of possible, practicable use in making bread, make the bread harmful, and that it would not use rotten or filthy potatoes; and if this implied agreement was not kept by plaintiff, it could not require the defendant to take the product. There is considerable conflicting testimony upon the point, and the question is submitted to you.

It is for you to say, gentlemen, whether or not the processing was carried on under reasonably sanitary conditions, and that due care was used to avoid using rotten or filthy potatoes, or permitting filth to get into the finished product, and for you to say, as I have already suggested, whether or not the sulphuring process was harmful, or might be harmful, under the conditions in which it was to be used. In passing upon this last question, you may consider the scientific or expert testimony upon the subject, and further the fact, if it be a fact, that the sulphur method is in common use, and that the government inspectors passed and permit the shipment of products so produced. I say, if the evidence shows that such are the facts, you may consider them as bearing upon the general question as to whether or not the sulphur process produces a product which may be harmful, and all other facts and circumstances in evidence, and, viewed in the light of your own observation and common sense, in the practical affairs of life."

Since the question of implied warranty as to wholesomeness became an issue in the case, a matter which the court left to the jury, the burden was cast upon plaintiffs to show that their product was such as did not come within the interdiction of the statute. Merriman v. Chapman, 32 Conn. 146; Gardiner v. Davis, 110 Me. 310, 86 Atl. 176. It was on this hypothesis that the court instructed the jury that plaintiffs could not recover, if they found that the product might be harmful; that is, injurious to health.

The use that was to be made of the potato product by defendant was to grind it into flour, and this flour was to be used in combination with wheat flour at a ratio of 8 to 15 per cent. of the potato flour. The investigations of the experts proceeded upon this hypothesis, and the testimony all the way through took into account the purpose of the defendant in combining potato flour with wheat flour in these percentages. The inquiry, it should be said, also extended minutely respecting the effect the added ingredient would have upon the potato flour, without combination with wheat flour.

Having premised as much, it is the strong contention of counsel for defendant that the court should have instructed the jury in the language of their requested instruction, namely, that it was sufficient to defeat the action if it was shown that it (the added ingredient, sulphur dioxide) "may or might possibly or probably be harmful to health of consumers." In view of the fact that the statute was designed to protect the public health from possible injury, the Supreme Court has, and rightly so, it seems to us, given it a broad construction, to render it effective in its utmost intendment.

Supplementing the definition of "may" as given by the Supreme Court in the Lexington Mill Case, and extending it to the word "might," the word comprises all the possible rather than the reasonably probable consequences. State v. Denny, 17 N. D. 519, 523, 117 N. W. 869.

"The word 'might' is the preterit of the word 'may,' which, according to the best lexicographers simply means 'to be possible,' and 'might' is defined by Webster as equivalent to 'had power' or 'was possible.'" Owen v. Kelly, 6 D. C. 191, 193.

The court, in I. W. Scott & Co. v. Railway Co., 172 Pa. 646, 652, 33 Atl. 712, 713, in speaking of the word "possible," has this to say

(quoting from Railway Co. v. Trich, 117 Pa. 390, 11 Atl. 627, 2 Am. St. Rep. 672):

"But things or results which are only possible cannot be spoken of as either probable or natural; for the latter are those things or events which are likely to happen, and which for that reason should be foreseen. Things which are possible may never happen, but those which are natural or probable are those which do happen, and happen with such frequency or regularity as to become a matter of definite inference."

Assuming, without deciding, that the requested instruction was one proper to have been given, it was not reversible error not to give it, if it was adequately covered by the general charge. The court, in its charge, adopted, in effect, the language of the statute in defining the particular issue and in advising the jury as to what they were called upon to decide. It did not go further to define the word "may" as the courts have defined it, nor did it say to the jury that it comprised possible consequences, as well as probable, as the language of the requested instruction imports. The language of the court, as that of the law, is not couched in technical terms, but is plain, simple, and understandable to the common mind.

"The law does not require courts to define ordinary words and phrases. An intelligent juror understands what they mean." Akin v. Bradley Engineering & Machinery Co., 51 Wash. 658, 99 Pac. 1038.

"May" and "might" are words of most common use, and it would be an aspersion upon the intelligence of a jury to affirm that they did not understand their meaning and significance; nor does the context of the instruction or of the law render them less understandable. If we should interpolate the word "possibly" in the context of the law, making it read "may possibly" render such article injurious to health, we would only express what the word "may" implies by its common significance, and what every person of common intelligence must be presumed to know and understand, and we must presume that the jury did so understand its meaning, when given to them in the plain language of the court. Furthermore, the significance of the word "may" or "might" is not to be taken as including every conceivable possibility, but must be reasonably applied, having in mind the purpose of the statute and the injury or possible wrong which it was designed to prevent.

So, in the present case, the issue was whether the added ingredient, the sulphur dioxide, might render the product harmful to health. The facts and circumstances attending the controversy were all to be taken into account, and in view thereof it was to be considered whether it might reasonably be anticipated by considerate persons, mindful always of conserving the health of the consumer, that the product would, in the ordinary course of human events, possibly prove harmful or injurious to health. We think that the jury was not only not misled by the instruction, but that they adequately understood what was required of them in deciding the issue.

It follows that the court committed no error in refusing the requested instruction, and in giving those here considered. What we have said applies as well to the issue relative to filth, which it is alleged rendered the product impure and unhealthful.

The criticism of the use of the language "some circumstances be harmful" is hypercritical. The words "some circumstances," of course, do not include all circumstances; but they may comprise the stronger within the bounds of the inquiry, against the use of the added ingredient.

The defendant's second and sixth requested instructions are clearly covered by the general charge.

As to the fourth requested instruction, the court submitted to the jury, first, whether there was an implied warranty on the part of plaintiffs that the potatoes would not be processed in such a manner as to render them deleterious to health; and, if they so found, second, whether the product as processed was in fact detrimental to health. This was all defendant could ask, and it was not important that the statute rendered the sale unlawful, if the product was unhealthful.

All other exceptions to the general charge are either covered by instructions given, or are without cogency, unless it be the exception to the forms of verdict submitted, on the ground that neither of them authorized a recovery of damages on the part of defendant under the assumption that there was an implied warranty that the product was not decomposed or filthy, or not adulterated with the sulphur dioxide, so as to render it injurious or deleterious to health. The exception, by its wording, relates to a certain amount of the product still on hand and in the possession of the defendant at the time the action was instituted. An issue was tendered by a further and separate answer, and defendant claimed damages by reason of noncompliance with the alleged warranty in this respect. The question of defendant's alleged right of recovery on that ground was really never submitted to the jury by the instructions of the court. There was, however, no exception reserved to the lack of instruction upon the question, and no requested instructions were submitted covering the supposed issue.

We are of opinion that exception to the mere form of the verdict was insufficient to present the question here of the want of proper instructions covering the issue tendered by the pleadings. But, however this may be, the court having amply covered by its general charge the question of an implied warranty as to the wholesomeness of the potatoes as a food product, in so far as it related to their alleged filthy condition and adulteration with an added ingredient, namely, sulphur dioxide, and the jury having found for plaintiffs on the issue, as they must necessarily have done in rendering a general verdict for plaintiffs, the failure to instruct as to defendant's right to recover, should the jury find in its favor under the warranty, it is obvious, resulted in no injury to the defendant, and the error, if one were committed, is not reversible in character.

We may now turn our attention to the court's rulings during the trial. The first assignment of error relates to matter that the court made use of for illustration; the second, to remarks of counsel which were construed by counsel for defendant as intended to prompt the witness; the third, to certain testimony of Cardiff, wherein he was permitted to refer to his books for the information sought. The fourth

relates to an inquiry as to why plaintiffs purchased No. 1 potatoes instead of No. 2, so designated; the fifth, to the manner of handling the potatoes while being prepared for drying; and the sixth, to the court's refusal to permit cross-examination as to a matter involved by the examination in chief. In all these, there was clearly no error in the court's action.

Assignments 7 and 28 relate to some experiments of witnesses in placing sliced potatoes in water, to prevent oxidization, the purpose of which seemed to be to prove that it was unnecessary to use sulphur dioxide to preserve the white color. The attempted inquiry was immaterial, as sulphur dioxide had been used, and the real question was whether such use rendered the potatoes unfit for food consumption. There was no error in rejecting the testimony.

As to assignments 8 to 22, inclusive, it is sufficient to say that we have examined them in detail, and find no error. To state the issue involved by each of these assignments, and to discuss them severally, would unduly prolong the opinion of the court.

Assignments 27a and 28a (which we so designate to distinguish them from preceding assignments numbered 27 and 28), are untenable, on the grounds, first, that the witnesses White and Marshall were not shown to be qualified to answer; and, second, the hypothetical questions propounded to them were not based upon the facts proven.

The twenty-ninth assignment relates to an attempted reformation of the contract involved by the controversy. The witness Stanley was asked to narrate the conversation he had with Cardiff at the time the samples were produced, but prior to March 18th, the date of the execution of the agreement; that is, the conversation leading up to the agreement. An objection was sustained to the question, to which defendant excepted. Then this further question was asked:

"Was there any mistake in the reduction of that contract to writing and getting in the terms of the agreement that you had really made?"

To which, also, an objection was sustained. To get the effect of the instant controversy, the colloquy of counsel may well be recited. Plaintiffs' counsel interposed,

"I object, if the court please, if it has relation to the making of the terms of the contract. If there was any conversation relative to the sample, we have no objection to it. If it is an attempt here, under the guise of bringing out a conversation on one subject, to alter the terms of a written contract, we want to save our objection."

To which, after the ruling by the court, defendant's counsel replied:

"The defendant excepts to the ruling. I will state, if your honor please, probably I should more expressly, it is our purpose to show that there are some differences between this contract as it was written up and signed and what they had really agreed upon, and we think there was a mistake in that regard. The contract was drafted wholly by them and presented for our signature, and we want to show that, and to have the contract reformed to that extent; the mistake being in leaving out the agreement that was made, express agreement, as to the quality."

Assuming, without deciding, that it was legally competent to have the contract reformed in a court of law, the question really presented

was whether defendant was entitled to have it reformed, so as to introduce an express warranty of high quality of the commodity sold. The court adopted the theory, and we think properly, having in view the development of facts as the case proceeded under the evidence, that the sale was by sample, but submitted the question to the jury whether it was or not. If by sample, the sample became the measure as to kind and quality, and there was no need of reformation. The testimony shows beyond question, and the defendant admits, that its representative took samples of the potato chips, two in number, one of a smaller and another of a much larger amount, and experimented with them to his satisfaction, before the contract was finally consummated, or reduced to writing and signed. The controversy is slight, but one proper to submit to the jury, touching whether the parties entered into the contract with reference to the sample. We think, in view of the record, there was no error in the course pursued by the court.

Assignment 34 relates to a controversy touching whether Stanley, a witness called for defendant, should be permitted to testify as to the effect the color of potato flour would have upon its sale in the market. The court at the time was inclined to the opinion that the testimony was not pertinent, and, the witness having injected into his answer matter that was deemed not responsive, the court said, "Mr. Stanley, did you willfully add that last statement?" The witness replied, "No, your honor, I did not." Later, when it came to the rebuttal, plaintiffs' counsel called one Masters, and was about to interrogate him respecting the effect that dark color would have upon the flour in the market, to which defendant objected. Thereupon, at the court's suggestion, defendant was permitted to recall Stanley, who then testified respecting the matter that was ruled out when he was first on the stand.

It was insisted that Stanley should first testify, before Masters was permitted to proceed with his rebuttal. Complaint is made that, because of the supposed reprimand of the witness Stanley by the court, and the confusion resulting from the proceeding whereby Stanley was not permitted to testify, the proceeding was prejudicial and harmful to defendant's cause. It is by no means clear that such was the case. The court has a discretion in directing the method of procedure at the trial, to meet the ends of justice, and we find no abuse of such discretion attending the immediate controversy. It is obvious that what the court said to the witness was designed rather to control the drift of the particular inquiry than to reprimand him before the jury.

In this relation, we turn to assignments 40 and 44. The complaint is that plaintiffs were permitted to introduce evidence in rebuttal which was a part of their case in chief. The court most insistently confined the witness to the fitness of the dehydrated potatoes for human consumption as an article of food; the witness being permitted to take into consideration the sanitary condition of the plant at the time. The testimony was clearly in rebuttal, and there was no error.

Assignments numbered 26, 27, 30, 31, 33, and 36 involve largely an inquiry sought to be made touching the quality of the potatoes delivered as to color, and certain supposed faults, as black spots, including dry rot, and the use of green potatoes in the course of dehydration. Testi-

mony was offered with the purpose of showing that these conditions existed as respects the product that was delivered to the defendant, which in general was rejected by the court. It was the contention that the testimony was admissible and pertinent, because it was insisted that there was, if not an express, an implied, warranty attending the contract as to the merchantability of the product and its fitness for the uses and purposes for which it was purchased by defendant; that is to say, its manufacture into flour, its use in combination with wheat flour, and its sale upon the market to meet the demands of war conditions.

To clarify the situation somewhat, a restatement of the salient features of the case will not be amiss. A portion of the product, perhaps the larger part, was delivered to the defendant. The remainder was never so delivered, but after being manufactured was retained for the defendant in plaintiffs' warehouse; it being claimed that this portion in all respects conformed to the contract, and that defendant, although refusing to take it, as agreed, from the warehouse, was bound to accept it under the terms and conditions of the contract. As the trial proceeded, the very pertinent question arose as to whether, under the development of the facts and circumstances attending the contract, the sale was not by sample, and obviously the court was of the opinion that the cause should be submitted to the jury upon that theory, leaving it to the jury to say whether such was the case or not. The court furthermore submitted to the jury the question whether there was an acceptance by the defendant of the part of the product delivered to it.

Defendant stoutly insists that, notwithstanding all this, and aside therefrom, there was at least an implied warranty of fitness and merchantability, and that the remedy for a breach thereof even "survives acceptance of the goods sold." Generally, where goods are sold to be delivered, the rule supported by the weight of authority is that—

"If the goods, upon arrival at the place of delivery, are found to be unmerchantable in whole or in part, the vendee has the option either to reject them, or receive them and rely upon the warranty; and, if there has been no waiver of the right, he may bring an action against the vendor to recover the damages for a breach of the warranty, or set up a counterclaim for such damages in an action brought by the vendor for the purchase price of the goods." English v. Spokane Com. Co., 57 Fed. 451, 6 C. C. A. 416; Tacoma Coal Co. v. Bradley, 2 Wash. 600, 27 Pac. 454, 26 Am. St. Rep. 890.

It is said by the court in Grisinger v. Hubbard, 21 Idaho, 469, 471, 122 Pac. 853, Ann. Cas. 1913E, 87, that the "acceptance of the goods does not waive the warranty, and the warranty survives the acceptance." This was not a sale by sample. It is however, a rule of equal significance that, if the goods conform to the contract between the parties, the vendor has his right of action for goods sold and delivered, without any formal acceptance by the buyer. Brigham v. Hibbard, 28 Or. 386, 387, 43 Pac. 383, and cases therein cited. Sale of goods to be manufactured is governed by the same rule; but, in order that title may pass, the goods must conform as to quantity and quality with the specifications of the order or contract. In case they do not so conform, an acceptance by the purchaser would be necessary to complete the sale. Johnson v. Hibbard, 29 Or. 184, 188, 44 Pac. 287, 54 Am. St.

Rep. 787. The authorities speak of a sale by sample as usually accompanied by an implied warranty—more properly, a condition precedent—that the bulk delivered shall conform to the sample by which the sale is made, in kind, character, and quality. 10 Am. & Eng. Enc. of Law (1st Ed.) 165; Pope v. Allis, 115 U. S. 363, 372, 6 Sup. Ct. 69, 29 L. Ed. 393; Wadhams v. Balfour, 32 Or. 313, 51 Pac. 642; Beirne v. Dord, 5 N. Y. 95, 55 Am. Dec. 321. In this last case, it is said, in effect, that if the goods do not conform to the sample the purchaser may either rescind the contract, by returning the goods in proper time, or keep them and recover damages for breach of such warranty.

Implied warranty, as applied to sales by sample, is really a matter of terminology. "Strictly speaking," says the court in Gunther & Rodewald v. Atwell, 19 Md. 157, 167, "a contract of sale by sample is not a warranty of quality, but an agreement of the seller to deliver, and of the buyer to accept goods of the same kind and quality as the sample. The identity of the goods sold, in kind, condition, and quality, with that of the sample is of the essence of the contract; and where the goods sold do not correspond with the sample, there would seem to be no performance of the contract."

[3] It must be conceded, however, that where the sale is by sample, and there has been an acceptance after inspection of the commodity, or there has been reasonable opportunity for inspection, either before or after delivery, to determine whether the commodity conformed to the sample, the sale is concluded, and the vendee is bound by his contract of purchase; and while it may be said that an implied warranty of kind and quality accompanies the purchase, there must be a time when the controversy comes to an end, and it is unreasonable and unusual for the purchaser to insist that, at any time after acceptance, however remote, he has a right to resort to the warranty for recoupment of damages. The principle should not be lost sight of that, where the commodity conforms to the sample, there is complete performance of the contract of sale.

In the instant case a controversy arose, as the evidence amply indicates, after a large amount of the potato chips had been delivered and taken to the defendant's mill, touching whether they conformed in kind and quality to such as the defendant purchased, and, after some correspondence and conference between the parties, many of the chips were returned to plaintiffs, and others delivered in their place. Negotiations finally went so far that the defendant, at the invitation of plaintiffs, sent an agent to the plaintiffs' warehouse, with authority to inspect the chips as they were being delivered, so that all the chips received by defendant were thus submitted to a rather careful and minute inspection by the defendant. The case really turned upon whether there was an acceptance as corresponding to sample, and the matter sought to be introduced thereby became irrelevant and immaterial, and we think there was no error in the assignments last noted.

The two letters covered by assignment 35 constitute certain demands by the defendant upon the plaintiffs, and are of no evidentiary value for the purpose for which they were offered.

Assignments 59 and 60 relate to the refusal of the court to permit expert witnesses to read from scientific books published by the Harvard University Press. Under the conditions prevailing, the court was right in its ruling. Davis v. United States, 165 U. S. 373, 17 Sup. Ct. 360, 41 L. Ed. 750.

We are satisfied, from a careful review of the entire record, that defendant has had a fair trial, and that no reversible error was committed.

Affirmed.